No. 102,036

STATE OF KANSAS, *Appellee*, v. MARLIN WILLIAMS, *Appellant*.

(329 P.3d 400)

Opinion filed June 27, 2014.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: After considering Marlin Williams' appeal from a jury conviction for aggravated trafficking in violation of K.S.A. 21-3447(a)(2), the Court of Appeals, in *State v. Williams*, 46 Kan. App. 2d 36, 257 P.3d 849 (2011), upheld the constitutionality of K.S.A. 21-3447(a)(2), concluding the provision is not overbroad. Also, because Williams' conduct clearly fell within the terms of K.S.A. 21-3447(a)(2), the Court of Appeals determined that Williams lacked standing to raise an argument that the provision is unconstitutionally vague. The Court of Appeals also rejected Williams' other arguments in which he claimed: The charged offense of aggravated trafficking is identical to the offense of promoting prostitution, promoting prostitution is a more specific offense than aggravated traf-

ficking, the prosecutor committed misconduct, and the district court should have submitted the question of his criminal history to a jury.

On review, we agree with the Court of Appeals, although we occasionally depart from its reasoning, and affirm Williams' conviction and sentence.

## FACTS AND PROCEDURAL BACKGROUND

On May 4, 2007, a Dallas, Texas, police detective was patrolling an area known for prostitution activity when he observed a young girl walking along the street. A Ford Explorer, which the detective recognized as the vehicle of a known prostitute, pulled up near the young girl, but the young girl kept walking when she spotted the clearly marked patrol car. The girl's youthful appearance and behavior aroused the detective's suspicions, causing him to follow her to a gas station where he stopped her and asked for her name and birth date. She offered a birth date that seemed obviously false to the detective, so he continued to talk to her. She eventually told him her real name—L.M.—and her date of birth date—October 10, 1991. Upon learning L.M.'s true identity and that she was only 15 years of age, the detective investigated further and discovered L.M. had been reported as a runaway from Wichita, Kansas. L.M. was transported to Dallas police headquarters for an interview. In the interview, L.M. explained she met a pimp in Wichita named "Pressure" in late April or early May. Pressure recruited her to join his prostitution ring and then drove her from Wichita to Dallas so she could work for him. L.M. gave detectives permission to examine the phone she had with her; the detectives found a phone number with a Wichita area code labeled "Preasure."

L.M. was returned to Wichita. Once there, she learned that Pressure's real name was Marlin Williams. She reported this to law enforcement officers in Wichita.

After an investigation, the State filed charges against Williams alleging that "on or between the 1st day of April, 2007 and the 5th day of May 2007" Williams unlawfully recruited, harbored, transported, provided, or obtained by any means L.M., a child under 18 years of age, knowing L.M., with or without force, threat or

coercion, would be used to engage in sexual gratification of the defendant or another in violation of K.S.A. 21-3447(a)(2).

At trial, L.M. provided details about her first contact with Williams; her first encounter was at a party, and the second was when Williams drove to the place she was living. During this second meeting, Williams, who was accompanied by a female prostitute, recruited L.M. to join in his prostitution ring.

L.M. explained that several weeks before she met Williams she had run away from the Wichita Children's Home. By the time L.M. met Williams, her living situation was rocky. She was living with a woman who had been unable to pay her rent or utility bills for several months; the water had been shut off, and they were losing electricity that week. "We never really ate much, and if we did, we always went to Save-A-Lot and stole stuff." Consequently, when Williams asked her to work as a prostitute, she agreed because she "didn't have no choice; it was just the first choice that came up." She admitted, "I knew what I was getting myself into."

After L.M. agreed to go with Williams and they drove away in his car, he asked if she wanted to immediately travel to Texas. She agreed but asked to call the woman with whom she had been living and to get her clothes and belongings. Williams refused, fearing she would change her mind. He promised to buy her clothes and whatever she needed once they got to Dallas, although L.M. testified that he never did. He also laid down some rules, telling L.M. that "he didn't like his girls—which is the word he used; let's make that clear, girls—to look at any other man. He wanted them to look down and don't speak unless you're spoken to unless I say you can respond."

Before leaving Wichita, Williams stopped at a house. The female prostitute—whom L.M. estimated to be about 20 years of age— and L.M. stayed in the car, and L.M. asked the woman what prostituting was like, whether Williams would buy her condoms, and what he would do if she looked at anyone. Williams then took L.M. and the woman to an apartment where he told L.M. to undress so he could look at her. After the inspection, Williams drove to another location and picked up a man he called "Casper" and then to a hotel where the woman was staying so she could get her be-

longings. Before they left Wichita, Williams told L.M. she should not be working the streets because she "is far too pretty for that" and once he had enough money she would be working in a club. Williams also told L.M., "My ho's make money."

The woman and Casper accompanied Williams and L.M. to Dallas. Once they got to a hotel, Williams told L.M. to perform oral sex on him. When during the trial L.M. was asked why she obeyed, L.M. responded, "That's just what you have to do. And I believe he said that to[o], like, . . . You got to do what I say." Soon after Williams' demand and within hours of arriving in Dallas, Williams told L.M. the minimum amount she should charge for various sex acts and the minimum she had to make before she returned to the hotel. He then gave her a beeper phone and sent her out to walk the streets.

L.M. testified she and Williams stayed in three hotels over the next several days. After the first day, L.M. worked 10 to 12 hours a day, starting at the times Williams directed. According to L.M., she made about $1,000 per day and she gave all of that money to Williams, except for a relatively small amount of cash she had on her when she was taken into custody by the police. Williams would periodically check on her, asking her where she was and how much she had made. Every few hours she would return to the hotel to give Williams the money she had been paid and to shower. She only ate when Williams would bring her food; she denied ever using the money she made to buy food or drink.

Managers of two Dallas hotels also testified at trial. One manager testified Williams stayed at his hotel on April 29, 2007, in a one-person room. The other indicated Williams checked into a four-person room and stayed May 3 and 4, 2007.

At trial, Williams testified in his own defense. He told the jury that he stayed at the first hotel on April 29, 2007, with a woman he met in Dallas. He denied going to Dallas with L.M., but he did admit to seeing her as he was leaving his hotel. According to Williams, they simply made eye contact and gestured toward each other. Williams indicated he then returned to Kansas and, on May 3, 2007, drove back to Dallas with his girlfriend, their son, and his girlfriend's niece for the purpose of shopping for clothes. Williams

testified that he again saw L.M., this time at the second hotel's swimming pool. She walked up and said, "I know you from somewhere." After some small talk, they realized they were both from Wichita and the conversation continued from there. L.M. asked him to get her some liquor, and he took her to the liquor store. While driving to the liquor store she asked for his phone number, and he gave it to her. He also gave her his nickname "Pressure." He testified that L.M. told him she was 19 or 20 years old.

The jury found Williams guilty of aggravated trafficking under K.S.A. 21-3447(a)(2). The district court imposed a downward durational departure sentence of 246 months' imprisonment.

Williams timely appealed his conviction to the Court of Appeals. As noted, that court rejected Williams' claims and affirmed his conviction and sentence. *Williams*, 46 Kan. App. 2d at 38, 56. Williams filed a petition for review, asserting the same arguments he brought before the Court of Appeals.

In those issues, which we have reordered and consolidated for purposes of our discussion, Williams asserts: (1) The aggravated trafficking statute is unconstitutionally overbroad because it prohibits constitutionally protected activities such as speech, association, and travel and is unconstitutionally vague because it does not define the terms "used" or "sexual gratification"; (2) the charged offense of aggravated trafficking is identical to the offense of promoting prostitution, and Williams should have received the shorter sentence for promoting prostitution under the identical offense sentencing doctrine; (3) the district court erred in entering a conviction for aggravated trafficking when the evidence supported the more specific offense of promoting prostitution; (4) the prosecutor committed misconduct during closing arguments by improperly commenting on the credibility of L.M. and Williams and by shifting the burden of proof to Williams; and (5) the district court erred in increasing his sentence based on prior convictions not proven to a jury.

This court granted Williams' petition for review under K.S.A. 20-3018(b) and has jurisdiction under K.S.A. 60-2101(b).

## CONSTITUTIONALITY OF K.S.A. 21-3447(a)(2)

In Williams first two issues on appeal, he contends that the subsection of the aggravated trafficking statute he was convicted under, K.S.A. 21-3447(a)(2), is unconstitutionally overbroad and vague. K.S.A. 21-3447(a)(2) defines the offense of aggravated trafficking as

"recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be used to engage in forced labor, involuntary servitude or sexual gratification of the defendant or another."

Referring to those provisions, Williams argues K.S.A. 21-3447(a)(2) is unconstitutionally overbroad because it infringes on constitutionally protected rights of "speech (recruiting), travel (transporting), or association (providing, obtaining) with a minor knowing that the minor 'will be used to engage in' the sexual gratification of the defendant or another." As he did before the district court and Court of Appeals, Williams further argues that the statute does not prohibit sexual activity but instead prohibits "thoughts, ones that are sexual in nature, by the defendant or another resulting from the defendant's actions involving a minor."

To illustrate the potential constitutional infringements that could arise from enforcement of these provisions, Williams offers several hypothetical examples. First, he suggests the statute infringes on the United States Constitution's First Amendment speech protection by prohibiting "a person from requesting a 'date' with a minor (recruiting) when the person making the request knows that they will be sexually gratified by the experience." Second, he asserts that even flirting with a minor (recruiting) would be criminal. Additionally, he presents the scenario of a father driving (transporting) his child to the high school prom knowing the child will engage in sexually gratifying activities. Finally, he suggests the statute constitutes an unwarranted and intolerable intrusion into the marital relationship by preventing lawfully married minors from traveling for their honeymoon. These examples, according to Williams, illustrate that K.S.A. 21-3447(a)(2) is overbroad because it criminalizes constitutionally protected activities and is vague because it

leaves a person of common intelligence to guess whether the minor was "used" or whether these activities can lead to "sexual gratification." See *State v. Wilson*, 267 Kan. 550, 556, 987 P.2d 1060 (1999) (explaining " 'a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is constitutionally protected' ").

### 1. *Does Williams Have Standing?*

Before addressing the substance of Williams' arguments, we first consider the question of whether Williams has standing to argue K.S.A. 21-3447(a)(2) is unconstitutional. This question arises because Williams concedes the conduct L.M. attributed to him clearly falls within the terms of the statute; further, he does not argue that conduct is constitutionally protected. Nevertheless, he suggests other conceivable factual scenarios might impact hypothetical defendants and argues those scenarios illustrate the statute is vague and overbroad.

The State argues Williams lacks standing to assert the statute is vague, but it does not object to Williams' standing to argue the statute is overbroad. Some general discussion of standing is necessary to explain the reason for the State's differentiated response to Williams' arguments and the basis for our conclusion that Williams does indeed lack standing to argue the statute is unconstitutionally vague but has standing to pursue his arguments regarding the statute's overbreadth.

Generally, "if there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979); see *State v. Thompson*, 221 Kan. 165, 172, 558 P.2d 1079 (1976) (holding that "unconstitutional governmental action can only be challenged by a person directly affected and such a challenge cannot be made by invoking the rights of others"). This general rule suggests that Williams lacks standing.

The general rule does not apply, however, when a litigant brings an overbreadth challenge that seeks to protect First Amendment rights, even those of third parties. Instead, an exception has been recognized "because the mere existence of the statute could cause a person not before the Court to refrain from engaging in constitutionally protected speech or expression." *City of Wichita v. Wallace*, 246 Kan. 253, 267, 788 P.2d 270 (1990) (citing *Young v. American Mini Theatres*, 427 U.S. 50, 60, 96 S. Ct. 2440, 49 L. Ed. 2d 310, *reh. denied* 429 U.S. 873 [1976], and *Broadrick v. Oklahoma*, 413 U.S. 601, 611-14, 93 S. Ct. 2908, 37 L. Ed. 2d 830 [1973]).

Consequently, Williams does have standing to assert on behalf of third parties that K.S.A. 21-3447(a)(2) is overbroad. The exception does not extend to arguments of vagueness, however. Instead, a party asserting vagueness "cannot challenge the constitutionality of the statute on the grounds that the statute may conceivably be applied unconstitutionally in circumstances other than those before the court." *Tolen v. State*, 285 Kan. 672, Syl. ¶ 2, 176 P.3d 170 (2008); see *Hearn v. City of Overland Park*, 244 Kan. 638, 639, 772 P.2d 758, *cert. denied* 493 U.S. 976 (1989) (one to whom statute clearly applies may not successfully challenge it for vagueness). This means that Williams does not have standing to argue K.S.A. 21-3447(a)(2) is vague, and we will not reach a holding regarding his vagueness arguments. Nevertheless, we will briefly discuss one aspect of that argument—the failure to define "used"—because it overlaps with the consideration of whether the statute is overbroad.

We turn to a discussion of whether the statute is overbroad.

### 2. *K.S.A. 21-3447(a)(2) Is Not Overbroad*

Williams' argument that K.S.A. 21-3447(a)(2) is overbroad requires us to interpret the statute and presents a question of law, which is subject to unlimited review. *State v. Whitesell*, 270 Kan. 259, 268, 13 P.3d 887 (2000). The fundamental rule we follow in interpreting a statute is that the intent of the legislature governs. "To divine legislative intent, courts begin by examining and interpreting the language used. Only if that language is ambiguous do we rely on any revealing legislative history or background considerations that speak to legislative purpose, as well as the effects of

application of canons of statutory construction." *State v. Brown*, 295 Kan. 181, Syl. ¶ 5, 284 P.3d 977 (2012).

The separation of powers doctrine requires a court to presume the statute is constitutional. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883, 179 P.3d 366 (2008). Williams, as the party attacking the statute, has the burden to overcome that presumption. To do so, he must do more than imagine a conceivable activity that would be constitutionally protected but would run afoul of the aggravated trafficking statute because "[a]lmost every law is potentially applicable to constitutionally protected acts" and would be unconstitutional if any hypothetical, unconstitutional application was all that had to be established. *Whitesell*, 270 Kan. 259, Syl. ¶ 6. Therefore, a more rigorous standard applies. Where conduct and not merely speech is involved, the United States Supreme Court requires that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. This court has divided this burden into a two-part test. The party attacking the constitutionality of a statute on the basis of overbreadth must establish "(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications." *Whitesell*, 270 Kan. 259, Syl. ¶ 6.

Applying the two-part test, the district court, after hearing Williams' arguments, concluded that Williams had failed to establish his proffered hypothetical situations were a significant part of the law's target. The Court of Appeals agreed, citing *Wilson*, 267 Kan. 550, as instructive. See *Williams*, 46 Kan. App. 2d at 42. In his petition for review, Williams does not attempt to distinguish *Wilson*.

In *Wilson*, the defendants were convicted of endangering a child under K.S.A. 21-3608(a), which prohibits "intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." On appeal, the defendants argued the statute was unconstitutionally vague because it criminalized parental decisions to allow children to engage in lawful but potentially injurious activities, such as football, and overbroad because it

" 'regulates and inhibits the manner or mode in which ideas are expressed.' " 267 Kan. at 558.

The *Wilson* court rejected the defendants' arguments by declaring that "courts will not give strained meanings to legislative language through a process of imaginative hypothesizing; a common-sense interpretation of the statute is the guiding principle." 267 Kan. at 557. Further, the court noted that statutes like the child endangerment statute, which are designed to protect children, "are necessarily drawn with broad language because they are designed to cover a broad range of conduct and circumstances." 267 Kan. at 557 (citing *State v. Fisher*, 230 Kan. 192, 198, 631 P.2d 239 [1981]). But a commonsense reading of the statute indicates it prohibits " 'unreasonably' permitting a child to be placed in dangerous circumstances," which would "foreclose prosecution for such parental acts as permitting a child to play football" or using constitutionally protected means of expressing ideas. 267 Kan. at 558.

Likewise, K.S.A. 21-3447(a)(2)—the aggravated trafficking provision—covers a broad range of conduct and circumstances in order to protect minors from criminal trafficking. See Minutes, Sen. Judiciary Comm., February 16, 2005 (2005 Judiciary Minutes); L. 2005, ch. 200, secs. 2-3. Further, like the child endangerment statute, the aggravated trafficking statute has limiting words. Of particular import in light of Williams' arguments is the word "used." Although Williams argues the word is vague, in part because the statute does not define which of the word's multiple meanings applies, we conclude the word's context makes its meaning clear, and its meaning limits the scope of K.S.A. 21-3447(a)(2). Specifically, the phrase "used to engage in forced labor, involuntary servitude or sexual gratification" indicates the statute is limited to situations where a minor has been exploited. See Webster's II New College Dictionary 1215 (1999) (defining "use" as including "[t]o put to some purpose" and "[t]o exploit for one's own advantage or gain").

To the extent there is any question of this interpretation, the legislative history of K.S.A. 21-3446, defining the elements of trafficking, and K.S.A. 21-3447, defining the elements of aggravated trafficking, provides guidance. See *Brown*, 295 Kan. 181, Syl. ¶ 5

(if statute is ambiguous, courts may consult any revealing legislative history or background considerations that speak to legislative purpose). Both statutes were enacted in 2005 via S.B. 151; L. 2005, ch. 200, secs. 2-3.

Several proponents testified before the Senate Judiciary Committee and urged the bill's adoption. A representative of the Attorney General's office explained that S.B. 151 as it was originally proposed "deals with taking people against their will for forced labor and involuntary servitude or for sexual exploitation." 2005 Judiciary Minutes. At the same hearing, however, the Kansas Coalition Against Sexual and Domestic Violence requested an amendment to define aggravated trafficking to include situations in which a child under the age of 18 was the victim, regardless of whether there was evidence of force, fraud, threats, or coercion. 2005 Judiciary Minutes.

This proposal was consistent with the approach adopted in federal statutes regarding human trafficking offenses. This point was made in testimony presented by Kansas' current Secretary of State, Kris Kobach, who at the time was a law school professor. He summarized the federal statutes regarding sex trafficking, including those imposing criminal penalties for "sex trafficking of children *or* by force, fraud or coercion." (Emphasis added.) 2005 Judiciary Minutes, attach. 10, p. 3 (citing the Trafficking Victims Protection Act of 2000); see 18 U.S.C. § 1591 (2012) (as amended). Another proponent, who represented the Concerned Women for America of Kansas (Concerned Women), noted trafficking can occur even if there is no force, fraud, or coercion; it can be the result of " 'the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation,' " including sexual exploitation. 2005 Judiciary Minutes, attach. 8, p. 7 (quoting Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children—Annex II to the United Nations Convention Against Transnational Organized Crime, G.A. Res. 55/25, U.N. Doc. A/RES/55/25 [January 8, 2001] [ratified by the United States]); see *Velez v. Sanchez*, 693 F.3d 308, 323 (2d Cir. 2012) (quoting and discussing the protocol).

The Concerned Women's written testimony also discussed the connection between prostitution and trafficking as well as the vulnerability of women and children, particularly those living in poverty, "runaway girls and others in vulnerable situations [who] are in danger of getting lured into the trap of pimps and johns." 2005 Judiciary Minutes, attach. 8, p. 4. Likewise, a representative of the United States Department of State also mentioned the plight of "teenage girls . . . who have been trafficked into commercial sexual exploitation . . . [and] forced to service unthinkable numbers of men day after day." 2005 Judiciary Minutes, attach. 13, p. 2. These two proponents also emphasized that trafficking is not just an international problem but one affecting Kansas, and they referred to a then-recent incident involving a 20-year-old man and his father who "lured" several 13- to-16-year-old girls from a Wichita high school with promises of " 'day trips.' " The girls were then held in various hotels, given drugs and provocative clothes, and forced to work as prostitutes at truck stops in Oklahoma. 2005 Judiciary Minutes, attach. 8, p. 1; attach. 13, p. 2.

After hearing this testimony, the Senate Judiciary Committee and, later the entire legislature, adopted the proposed amendment regarding minors, which was codified at K.S.A. 21-3447(a)(2), and the remainder of S.B. 151. See L. 2005, ch. 200, secs. 2-3. The history suggests the legislature viewed the trafficking of minors, who are especially vulnerable because of age, to be a serious felony—at least a severity level 1 person felony and potentially an off-grid felony if the offender is 18 years of age or older and the victim is less than 14 years of age—even if force, fraud, threat, or coercion is not used. See K.S.A. 21-3447(b). Further, the overall history indicates the statutory aim was to prevent forced labor, involuntary servitude, or sexual exploitation, which the legislature clearly understood to include prostitution. 2005 Judiciary Minutes.

Considering this history and the wording of K.S.A. 21-3447(a)(2) in the context of Williams' argument, we conclude the clear target of the provision is a situation in which a minor's vulnerability is exploited through an abuse of power—i.e., where the minor is "used." Commonsense indicates minors are not exploited or used when they date, flirt, go to their high school prom, or travel with

their spouse. As the district court and Court of Appeals aptly determined, Williams' hypothetical scenarios do not represent a significant part of K.S.A. 21-3447(a)(2)'s target.

Accordingly, we hold that aggravated trafficking as defined in K.S.A. 21-3447(a)(2) is not unconstitutionally overbroad.

## AGGRAVATED TRAFFICKING IS NOT THE SAME AS PROMOTING PROSTITUTION

In two related issues, Williams seeks to have his criminal activity treated as the criminal offense of promoting prostitution, defined in K.S.A. 21-3513, rather than aggravated trafficking. In one argument, he seeks application of Kansas' identical offense doctrine and suggests that instead of being sentenced for the offense of aggravated trafficking under K.S.A. 21-3447(a)(2), a severity level 1 person felony, he should have been sentenced for the offense of promoting prostitution under K.S.A. 21-3513(a), which is a severity 6 person felony if the victim is under the age of 16. K.S.A. 21-3513(b)(3). In the other issue, Williams argues promoting prostitution is the more specific crime and, therefore, the one with which he should have been charged.

In making these arguments, Williams points to two portions of the statute defining the offense of promoting prostitution, K.S.A. 21-3513, specifically: "(a)(4) inducing another to become a prostitute" and "(a)(7) procuring transportation for, paying for the transportation of, or transporting a person within this state with the intention of assisting or promoting that person's engaging in prostitution." Because the aggravated trafficking statute prohibits, among other things, recruiting, transporting, or obtaining a person knowing the person will be used for sexual gratification, Williams argues that portions of the aggravated trafficking and promoting prostitution statutes overlap. He contends that "the term, 'for hire,' in the promoting prostitution statute encompasses the meaning, 'obtain the use of,' which is analogous to the 'used to engage in' from the aggravated trafficking statute." He further notes both statutes involve stimulation of sexual desires. See K.S.A. 21-3512 (defining "prostitution" as [a] performing or [b] offering or agreeing to perform for hire or for an exchange of value any of the following

acts: [1] sexual intercourse; [2] sodomy; or [3] manual or other bodily contact stimulation of the genitals of any person with the intent to arouse or gratify the sexual desires of the offender or another). .

The State responds that while the provisions overlap, they do not contain identical elements. Under promoting prostitution, the State would have been required to prove that the defendant intended for L.M. to engage in prostitution, which is not required under aggravated trafficking. Thus, the statutes address different conduct, and one is not the more specific version of the other.

We next address Williams' contention that the identical offense sentencing doctrine applies.

## 1. *Identical Offense Sentencing Doctrine*

This issue was first raised prior to Williams' sentencing when he filed a motion arguing the district court should apply the identical offense sentencing doctrine and sentence him to the lesser penalty of promoting prostitution. The district court recognized that the two offenses have some similarities but found there are substantial differences in the elements that must be proven for each offense and overruled Williams' motion. The Court of Appeals agreed, noting that promoting prostitution required proof of prostitution and prohibited transporting a person within the state, while aggravated trafficking does not. Further, aggravated trafficking requires proof of the victim's age, while promoting prostitution does not. *State v. Williams*, 46 Kan. App. 2d 36, 49-51, 257 P.3d 849 (2011).

On review of these holdings, the question of whether the district court and Court of Appeals erred in failing to apply the identical offense doctrine presents a question of law over which we exercise de novo review. *State v. Sandberg*, 290 Kan. 980, 984, 235 P.3d 476 (2010). That review requires a determination of whether the offenses are identical because the principle behind the identical offense sentencing doctrine is: " ' "Where two criminal offenses *have identical elements* but are classified differently for purposes of imposing a penalty, a defendant convicted of either crime may be sentenced only under the lesser penalty provision." ' *State v. Cooper*, 285 Kan. 964, 966-67, 179 P.3d 439 (2008) (quoting *State*

*v. Nunn*, 244 Kan. 207, 229, 768 P.2d 268 [1989]).” *State v. Snellings*, 294 Kan. 149, 151, 273 P.3d 739 (2012); *State v. Robinson*, 293 Kan. 1002, 1037, 270 P.3d 1183 (2012).

This court has recognized three types of situations where offenses may have identical provisions:

“(1) where one offense is a lesser included offense of the other; (2) where some provisions in two statutes overlap, the overlapping provisions apply to the charged crime, and the overlapping provisions are identical except for the penalty provisions; and (3) where all provisions in two statutes are identical except for the penalty provisions. The identical offense sentencing doctrine applies to the second and third situations. *State v. Campbell*, 279 Kan. 1, 14-15, 106 P.3d 1129 (2005) (quoting 4 LaFave, Israel & King, Criminal Procedure § 13.7[a], pp. 95-99 [2d ed. 1999]).” *Snellings*, 294 Kan. at 152.

Williams argues this case falls within the second category—overlapping statutes—and the Court of Appeals agreed. *Williams*, 46 Kan. App. 2d at 50. “When two statutes contain overlapping provisions, this court must examine the facts in order to determine the area of overlap. Once it is determined which provisions of a statute apply, the only question is whether the overlapping provisions contain identical elements. That determination is made from the statute.” *Cooper*, 285 Kan. at 967. But, as the Court of Appeals noted, “the test is not whether the facts would support an alternative charge but whether the applicable elements of the charged offense are identical to the elements of an offense imposing a lesser penalty, *i.e.*, what facts the State is required to prove to obtain a conviction.” *Williams*, 46 Kan. App. 2d at 50 (citing *Cooper*, 285 Kan. at 967).

As that principle applies in this case, while the fact that L.M. engaged in prostitution in Dallas was one circumstance used to prove the “sexual gratification” element of aggravated trafficking, that factual overlap is not determinative of whether the offenses of aggravated trafficking and promoting prostitution are identical. Rather, “the facts of the case are only relevant to determine which provisions of a statute apply—a preliminary step—not as a final step of examining the record to determine what evidence was used to prove the overlapping elements.” *Snellings*, 294 Kan. at 166. The final step, whether the overlapping provisions contain identical

elements, is a determination that is made from the statute. *Snellings*, 294 Kan. at 166; *Cooper*, 285 Kan. at 967.

As the State argues and the Court of Appeals concluded, the offense of promoting prostitution requires proof that the defendant induced or transported a person with the intent that the person engage in prostitution, *i.e.*, for the purpose of having the person perform sexual intercourse, sodomy, or any other bodily contact with the intent to arouse or gratify the sexual desires of another "for hire" or "where there is an exchange of value." K.S.A. 21-3513(a)(4); K.S.A. 21-3513(a)(7); K.S.A. 21-3512. In contrast, the offense of aggravated trafficking only requires proof that the defendant recruited or transported "knowing that the person . . . will be used to engage in . . . sexual gratification of the defendant or another"; the offense does not require proof that the defendant intended the person to perform sexual acts in exchange for something of value. K.S.A. 21-3447(a)(2).

For example, in this case Williams arguably could have been charged with aggravated trafficking based on his act of transporting L.M. to Texas for the purpose of having her perform sexual acts with him. The evidence established he told her to orally stimulate him as soon as they arrived in Dallas, and there is no indication L.M. participated because she agreed to an exchange for value. Rather, the evidence was that she felt compelled to do as Williams instructed. Thus, there was evidence Williams induced and transported L.M. with the intent to use her for his own sexual gratification, and the State did not have to prove that Williams' intended for L.M. to engage in prostitution in order to convict him of aggravated trafficking.

The Court of Appeals continued its analysis after holding that the aggravated trafficking provision did not require proof of promoting prostitution by contrasting the two statutes based on whether there was a requirement of travel within the state and proof of the victim's age. The Court of Appeals' analysis on these additional points raises several questions. For example, although the Court of Appeals correctly observed the promoting prostitution statute does not include an age requirement in defining the offense, it did not discuss the age element of the sentencing en-

hancement provisions. The question remains whether promoting prostitution is an identical offense to aggravated trafficking if the State uses age—including a victim of L.M.'s age—as an aggravating sentencing factor for someone convicted of promoting prostitution. See K.S.A. 21-3513(b) (using victim's age to define several severity levels for promoting prostitution sentence); K.S.A. 21-4643(a)(1)(E) (promoting prostitution if prostitute is less than 14 years of age is Jessica's Law off-grid felony offense); see also *State v. Reyna*, 290 Kan. 666, 675-77, 234 P.3d 761 (2010) (aggravating factor of age is an element of the crime if the State seeks to convict the defendant of the more serious offense for purposes of sentencing).

We need not burden this opinion with an extended discussion answering this and the other questions that arise from the Court of Appeals' analysis, however, because we have already found that one element of the offense of promoting prostitution is not an element of aggravated trafficking. Thus, the Court of Appeals' ultimate conclusion that promoting prostitution and aggravated trafficking are not identical offenses is correct, and it does not matter if there are additional differences.

In conclusion, the offenses of aggravated trafficking and promoting prostitution are not identical and the district court properly sentenced Williams for aggravated trafficking under K.S.A. 21-3447(a)(2), a severity level 1 person felony.

## 2. *Promoting Prostitution is Not the More Specific Offense*

In the alternative, Williams argues that because his conduct was prohibited by both statutes, he could only be convicted of promoting prostitution because it is a more specific offense than aggravated trafficking.

Before addressing the merits of this argument, a preliminary question arises regarding whether Williams preserved this issue for appeal. In his brief before the Court of Appeals, Williams acknowledged that he did not specifically argue the "general/specific offense doctrine" to the district court, but he argued that the issue "may be raised for the first time on appeal because it involves only a question of law and is finally determinative of the case. *State v.*

*Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007)." The State responded by citing *State v. Gibbens*, 253 Kan. 384, 387, 855 P.2d 937 (1993), in which this court held that the issue of a general-specific statute was not properly before the court because it had not been raised in the district court.

In considering the parties' arguments, the Court of Appeals concluded that Williams' case is distinguishable from *Gibbens* because *Gibbens* "involved an appeal that was solely related to the sentence imposed following the defendant's plea and he had never previously challenged his convictions at any point." *Williams*, 46 Kan. App. 2d at 51. We agree.

In *Gibbens*, the defendant pleaded nolo contendere to two counts of rape, and, prior to his appeal, he never sought to withdraw his pleas or present any type of challenge to his convictions. By entering the pleas, Gibbens waived any defect in the charging of the offenses or his convictions. See *State v. Phinney*, 280 Kan. 394, 398, 122 P.3d 356 (2005) (noting that K.S.A. 22-3602[a] does not authorize an appeal of a conviction based upon a plea, but, "[f]ollowing a plea, a defendant may . . . challenge the sentence imposed"). Consequently, when Gibbens argued for the first time on appeal that he should have been charged with the specific statute of aggravated incest instead of rape because the two victims were his stepdaughters, this court held that "no appeal was taken from any matter relating to the convictions themselves." *Gibbens*, 253 Kan. at 387. In contrast, Williams did nothing to waive his right to appeal his conviction.

Nevertheless, issues not raised below are generally precluded on appeal. *State v. Prine*, 297 Kan. 460, 468, 303 P.3d 662 (2013). Yet, as the Court of Appeals acknowledged, there are several exceptions to this general rule, including "when the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case." *State v. Herbel*, 296 Kan. 1101, 1116, 299 P.3d 292 (2013). In this case, the Court of Appeals accepted that because Williams' theory involved only a question of law and could be potentially determinative of the case, the theory was properly before the court for review. *Williams*, 46

Kan. App. 2d at 51. Again, we agree and next address the substance of the argument.

The rule on which Williams relies—that a general statute should yield to a specific statute covering the same criminal conduct—"is merely a rule of interpretation which is used to determine which statute the legislature intended to be applied in a particular case." *State v. Helms*, 242 Kan. 511, 514, 748 P.2d 425 (1988); see *State v. Cott*, 288 Kan. 643, 645, 206 P.3d 514 (2009); *State v. Williams*, 250 Kan. 730, 733, 829 P.2d 892 (1992). The issue of whether the rule applies is "a question of law, and an appellate court's standard of review of a lower court's statutory interpretation is unlimited." *Cott*, 288 Kan. at 645. Ultimately, because the rule is merely a means of determining legislative intent, it "must yield where there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity." *Helms*, 242 Kan. at 514; see *Cott*, 288 Kan. 643, Syl. ¶ 2.

Looking at the elements of the offenses of aggravated trafficking and promoting prostitution, the Court of Appeals panel in this case applied these principles and concluded that "promoting prostitution might be considered a more specific crime than aggravated trafficking in some cases," but not in this case. *Williams*, 46 Kan. App. 2d at 55. In reaching this conclusion, the panel, in part, engaged in an alternative means analysis. If we were to follow the same line of reasoning, the alternative means discussion would require a different analysis in light of decisions of this court filed after the panel's decision. See, *e.g.*, *State v. Brown*, 295 Kan. 181, Syl. ¶¶ 7-11, 284 P.3d 977 (2012) (adopting analytical structure for determining if statute provided alternative means of committing an offense). We need not sort out all of these arguments and developments, however, because we conclude there is a more straightforward answer: The legislative intent was not to have promoting prostitution control over aggravated trafficking.

As the court in *Cott* noted, when interpreting a statute an appellate court's first task is to " 'ascertain the legislature's intent through the statutory language it employs.' " *Cott*, 288 Kan. at 647 (quoting *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 [2007]). But, as occurred when this court in *Cott* compared the

aggravated endangerment of a child statute—K.S.A. 2005 Supp. 21-3608a(a)(1)—with driving under the influence with a child if a child under the age of 14 years was in the car at the time of the offense—K.S.A. 2005 Supp. 8-1567(h)—"we do not so easily ascertain the legislative intent to allow or disallow both charges in the language of the Kansas statutes." 288 Kan. at 647. The *Cott* court also noted that the legislative history was not instructive. 288 Kan. at 647.

In this case, however, the legislative history does provide information regarding legislative intent. As we have discussed, there was repeated testimony during the legislative hearings in which proponents emphasized the need to criminalize trafficking where the victims were used for prostitution. See Minutes, Sen. Judiciary Comm., February 16, 2006 (2005 Judiciary Minutes). Further, the legislature was advised there would be overlap between aggravated trafficking and other criminal offenses but were told the comprehensive aggravated trafficking provision was needed. Then-Professor Kobach, in listing various reasons the Kansas Legislature should adopt state legislation even though there was a federal trafficking statute, indicated that "cases may arise in which human trafficking offenses are part of a larger set of crimes. Prosecution of the defendants for these state crimes, along with the trafficking crimes, in a single state jurisdiction may offer the best prosecution strategy." 2005 Judiciary Minutes, attach. 10, p. 6. The United States Department of State representative also indicated a trafficking crime can involve other offenses; he specifically mentioned kidnapping and prostitution. But he urged passage of legislation criminalizing trafficking because "[c]urrent state statutes do not always cover the range of activities traffickers engage in" and "[s]tate laws specific to human trafficking help ensure there are no legal gaps in our efforts to confront trafficking at home." He further indicated that the trafficking legislation covers a wide range of activities where other state offenses only cover portions of the illegal conduct. 2005 Judiciary Minutes, attach. 13, p. 4. While the testimony of these conferees does not necessarily indicate legislative intent, the legislature's action of following the conferees recommenda-

tions, including amendments, is indicative of the intent to cover a wide range of activities.

This case is illustrative. Although the State's evidence may have been sufficient to sustain a charge against Williams for promoting prostitution, his conduct went beyond the behaviors targeted by that provision and more clearly fall within the scope of conduct the legislature intended to criminalize through the aggravated trafficking statute. As we have noted, Williams himself engaged in sexual activity with L.M. and did so in a manner that left L.M. feeling she had no choice but to comply with his request. Only charging promoting prostitution would not have covered all aspects of Williams' criminal intent when he recruited and transported L.M.

Additionally, L.M.'s testimony indicated Williams used L.M.'s vulnerability to lure her and to use her to his advantage—the type of exploitation the legislature determined warranted a harsher punishment. Williams exploited L.M.'s vulnerability as a minor by removing her to a different state where her contacts and resources would be limited and largely controlled by him. Moreover, he strictly controlled her behavior, her access, and her comings and goings. For example, he told her she could not call the woman with whom she lived, and he directed her to look down and only speak when she was given permission or when someone spoke directly to her. He frequently checked on her while she worked the streets and essentially forced her into servicing many men each day.

The level of control exerted by Williams, at least according to L.M.'s testimony, is illustrated by a statement defense counsel made in closing arguments. Defense counsel was pointing out reasons L.M. should not be believed, including the contradictory inferences that could be drawn from her testimony. While suggesting that aspects of L.M.'s testimony indicated Williams did not exert the level of control over L.M. that she at other times suggested, defense counsel summarized the inferences favorable to the State's position, which were that Williams "was the only person that has contact with this girl who can't get anything to drink by herself, who can't eat by herself, who apparently has to shower when she asks his permission, who apparently, can only go in or out when [Williams] lets her, and she doesn't have any clothes, and she can't

do anything without [Williams]." While defense counsel is correct that the jurors could have rejected these inferences that suggest L.M. was being used or exploited, the jurors could accept her testimony and infer that she was "used" by Williams in a manner the legislature determined should be punished as aggravated trafficking and in ways that are broader than those circumstances defined as promoting prostitution. See 2005 Judiciary Minutes.

Further, the analysis adopted by this court in *Helms*, 242 Kan. 511, is persuasive in light of the legislative history regarding S.B. 151, *i.e.*, K.S.A. 21-3447. In *Helms*, this court held the offense of indecent liberties with a child is not a more specific offense of rape when the victim is a minor. The court reasoned that allowing an individual who rapes a minor to receive a shorter sentence than someone who rapes an adult would provide less protection to child victims than adult victims. This view, the court concluded, "flies in the face of logic and reason. It requires an assumption that the legislature intended to afford less protection to the most vulnerable segment of our society." 242 Kan. at 515. Likewise, it flies in the face of logic to assume the legislature intended to afford less protection to those minors trafficked for prostitution than those trafficked for other forms of sexual exploitation, especially given a legislative record replete with testimony about traffickers luring young girls into prostitution rings.

Thus, although our reasons vary from those of the Court of Appeals, we hold that promoting prostitution is not a more specific crime under the facts of this case.

### PROSECUTORIAL MISCONDUCT

In Williams' next issue on appeal, he contends the prosecutor committed misconduct. Williams focuses on two comments: (1) a portion of the State's closing argument in which the prosecutor discussed the credibility of L.M. and Williams and (2) a portion of the State's rebuttal argument in which the prosecutor told the jurors that the defense had the same subpoena power as the State.

Appellate review of allegations of prosecutorial misconduct, including misconduct occurring during closing arguments, which need not be preserved by a contemporaneous objection, requires

a two-step process. First, the appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013) (citing *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 [2012]); *State v. Tosh*, 278 Kan. 83, Syl. ¶ 1, 91 P.3d 1204 (2004).

### 1. *Comments on L.M.'s Credibility*

Applying the first step of this analysis, Williams initially focuses on a statement made during the State's closing argument: The prosecutor emphasized that it was the jurors' duty to evaluate the credibility of the witnesses, including the weight and credit that should be given to the vastly different versions of events testified to by L.M. and Williams, stating:

"I wasn't playing [L.M.'s interview] for you to elicit sympathy. You know, you have a jury instruction that you should not use sympathy in your deliberations. The evidentiary value of that is it corroborates what it is that really happened to her. You know, just in the scheme of things, *she does not minimize her own immoral acts of what happened in this case. Doesn't that actually lend credibility to what it is that she's telling you?*

"*What about his credibility?* . . .

. . . .

"*His credibility. He can't come up with the simplest details to fend the basis of the story*—his job, his hair, his name, his whereabouts. You go off on reasonable doubt.

"Ladies and gentlemen, in every criminal case, the burden of proof is beyond a reasonable doubt. In order to find the defendant guilty, you must find the elements of the offenses beyond a reasonable doubt. You may still have a doubt and convict, as long as it's not a reasonable one. So weight and credit and context. *Yes, she has had a horrible life. Doesn't that make her even more credible, then?*" (Emphasis added to challenged statements.)

Williams argues these comments were outside the wide latitude allowed the prosecutor because the comments were the prosecutor's personal beliefs as to the reliability or credibility of L.M.'s testimony and the lack of Williams' credibility. The State responds

that these comments were not the prosecutor's personal opinion but rather reasonable inferences that the evidence supported L.M.'s credibility. The Court of Appeals agreed with the State. *Williams*, 46 Kan. App. 2d at 47-48 (quoting *State v. Scaife*, 286 Kan. 614, Syl. ¶ 5, 186 P.3d 755 [2008]). The parties' respective arguments point to different ends of the spectrum of our cases regarding a prosecutor's comments on witness credibility.

Williams points to the end representing a prosecutor's impermissible expression of his or her opinion about a witness' credibility. These cases apply the rule that a prosecutor is not allowed to offer a personal opinion on credibility because such a comment is "unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000) (credibility was crucial to the defendant's case and the prosecutor's repeated comments that defendant was a liar were the prosecutor's personal opinion and outside the wide latitude); see Kansas Rules of Professional Conduct (KRPC) 3.4(e) (2013 Kan. Ct. R. Annot. 601) ("A lawyer shall not: . . . [e] in trial, . . . state a personal opinion as to . . . the credibility of a witness. . . ."); KRPC 3.8 (2013 Kan. Ct. R. Annot. 614) (special duties of a prosecutor).

Specifically, Williams relies on *State v. Brinklow*, 288 Kan. 39, 200 P.3d 1225 (2009), to support his contention that the prosecutor's statements were her personal opinions. In *Brinklow*, the prosecutor made comments such as "I think that [a witness'] testimony was reliable. It was credible and as I'll show you more." 288 Kan. at 50. Applying *Pabst*, 268 Kan. 501, this court found that it was improper for the prosecutor to tell the jury that he thought a witness is reliable and credible. 288 Kan. at 50.

Pointing to the other end of the spectrum, the State relies on cases recognizing that a prosecutor has " 'freedom . . . to craft an argument that includes reasonable inferences based on the evidence,' " and, " 'when a case turns on which of two conflicting stories is true, certain testimony is not believable.' " *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009) (prosecutor's argument that witness did not have " 'motive' " to be untruthful was a fair argument based on the evidence; prosecutor may comment on "witness' motivations to be untruthful" [quoting *State v. Davis*, 275

Kan. 107, 121, 61 P.3d 701 (2003)]); see *State v. Armstrong*, 299 Kan. 405, 429, 324 P.3d 1052 (2014) (statement about defendant's "denial, half-truths, truths, other stories" was fair comment on evidence because defendant gave six inconsistent versions of the crime); *State v. Todd*, 299 Kan. 263, 285, 323 P.3d 829 (2014) (not misconduct to state that witness was not credible because statement was made in context of arguing witness was biased because of familial relationship to defendant and had criminal record of crimes of dishonesty); *State v. McReynolds*, 288 Kan. 318, 325-26, 202 P.3d 658 (2009) ("When a defendant has told one story during interrogation and a completely different story at trial, it would be difficult for a prosecutor to comment on the evidence without suggesting that untruths existed," and a prosecutor may "properly offer[] the jury an explanation of 'what it should look for in assessing witness credibility.' ").

In contrast, the prosecutor in this case never stated, "I think" or "she's credible." The prosecutor started her discussion about credibility by telling the jurors they "get to evaluate the credibility of witnesses in the case." The prosecutor continued by drawing the jurors' attention to specific evidence, the consistency of L.M.'s statements and testimony, and the evidence that corroborated L.M.'s version of events. The prosecutor also discussed evidence that discredited Williams' testimony. Following the discussion of the evidence, the prosecutor asked the jurors some rhetorical questions: Did the evidence make L.M. credible? Or did it make Williams credible?

This presentation was consistent with our holdings that "a prosecutor may explain the legitimate factors which a jury may consider in assessing witness credibility and may argue why the factors present in the current case should lead to a compelling inference of truthfulness." *Scaife*, 286 Kan. 614, Syl. ¶ 5; see, *e.g.*, *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010) (prosecutor's remarks in closing regarding victim's credibility the case "were generally in the nature of reviewing what [the witness] said, asking the jury to assess the credibility of her statements, and querying the jury why she would not have made up a more convenient story if in fact she had fabricated the story at all").

Placed in context, the prosecutor's statements directed the jury to the evidence that boosted or degraded the credibility of L.M. and Williams and were not the prosecutor's personal opinion about the witnesses' veracity. Thus, the statements were not outside the wide latitude allowed a prosecutor in discussing evidence and were not misconduct.

## 2. *Improperly Shifting the Burden of Proof*

Next, Williams objects to a statement the prosecutor made at the start of the State's rebuttal arguments. To place the prosecutor's comments and the parties' arguments in context, we must first recognize a statement made by defense counsel during closing arguments. Defense counsel pointed out that L.M. testified she and Williams had contact with other people who could have corroborated L.M.'s testimony. After pointing out that none of these potential witnesses had testified, defense counsel asked, "[W]hy isn't there more? Wouldn't there be more if it really happened like [L.M.] said?" Defense counsel then concluded by saying, "That's all the State needed, and they couldn't produce it. They couldn't find one witness, even though [L.M.] has told them names that may not even exist."

In apparent response, the prosecutor started her rebuttal argument by stating:

"*Where are all these witnesses?* He says that if the State had these witnesses with these funky names, they would have brought them in here to testify for you. *Guess what, ladies and gentlemen. The defense has subpoena power identical—*
"[Defense Counsel]: The burden is shifting, Your Honor.
"THE COURT: Overruled.
"[Prosecutor]: *The defense has subpoena power identical to the State.*" (Emphasis added to challenged statements.)

The Court of Appeals panel determined the challenged statements were not misconduct because the prosecutor was "clearly responding to defense counsel." The panel noted: " 'No prejudicial error occurs where the questionable statements by a prosecuting attorney are provoked and made in response to prior arguments or statements by defense counsel.' " *State v. Williams*, 46 Kan. App.

2d 36, 48, 257 P.3d 849 (2011) (quoting *McReynolds*, 288 Kan. at 325).

Until recently, two inconsistent lines of cases existed in Kansas caselaw regarding whether a prosecutor's statement is misconduct when the statement is made in response to defense counsel's argument. In *State v. Manning*, 270 Kan. 674, 701, 19 P.3d 84 (2001), for example, this court held that "[a]lthough the prosecution may present evidence in an area that is normally forbidden after a defendant has opened the door, the 'open door' rule does not apply to misconduct of counsel." On the other hand, without distinguishing *Manning* or similar cases, this court has often held that "no prejudicial error occurs—including prosecutorial misconduct—where the questionable statements are provoked and made in response to prior arguments or statements by defense counsel." *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008), *overruled by Marshall*, 294 Kan. 850; *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006); see *McReynolds*, 288 Kan. at 325 (citing *Murray*, 285 Kan. at 517). It is this line of cases on which the Court of Appeals relied in this case. *Williams*, 46 Kan. App. 2d at 48.

After the Court of Appeals' decision in this case, in *Marshall*, 294 Kan. 850, we discussed the two disparate lines of cases and reaffirmed the holding in *Manning*, stating that "a prosecutor commits misconduct by making an improper argument, even if the improper argument is made in response to arguments or statements by defense counsel. The open-the-door rule does not insulate a prosecutor from a finding of misconduct." 294 Kan. at 860. Instead, a "prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel. The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court." 294 Kan. at 861.

Thus, we do not end our discussion as did the Court of Appeals—*i.e.*, by simply noting that the comments were made in response to defense counsel's statement. Rather, although we con-

sider that context, we must consider whether the prosecutor's statements were an improper attempt to shift the burden of proof. In other words, was there misconduct?

In that regard, Kansas caselaw establishes that it is " ' "improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof." ' " *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012) (quoting *State v. Duong*, 292 Kan. 824, 832, 257 P.3d 309 [2011]); *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 (2010); see *Tosh*, 278 Kan. at 89-92. Nevertheless, " 'considerable latitude [is] granted to prosecutors to comment on the weakness' " of the defense. *Stone*, 291 Kan. at 18 (quoting *State v. Burden*, 30 Kan. App. 2d 690, 703, 46 P.3d 570 [2002], *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 [2003]); *McKinney*, 272 Kan. at 346 (where the jury has been properly instructed the prosecution has the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence).

In applying these principles, several decisions of this court have dealt with comments regarding a party's subpoena power and have drawn a line indicating a prosecutor cannot suggest a defendant must disprove the State's case. For instance, in a case Williams cites, *Tosh*, 278 Kan. 83, this court held that the prosecutor improperly attempted to shift the burden by rhetorically asking, " ' "[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen." ' " 278 Kan. at 92. Yet, if a defendant asks the jury to draw an inference that the State's evidence is not credible because the State did not call a witness to corroborate other evidence, we have held that the State can refute the inference by informing the jury that the defense has the power to subpoena witnesses, including those who would be favorable to the defense. See, *e.g.*, *State v. Naputi*, 293 Kan. 55, 63-64, 260 P.3d 86 (2011).

In *Naputi*, the defense argued that the jury could "assume that the therapist would not have helped the State's case because the State did not call him as a witness. The implication, then, is that the witness would have been beneficial to the defense." 293 Kan. at 64. In response, the prosecutor stated, " 'Where is the therapist

to talk about this case. . . . The defense has subpoena power just like the State does. If they wanted to get the therapist in here to discount the quality of those feelings, they were welcome to do so and did not.' " 293 Kan. at 63. The *Naputi* court determined that it was "within the wide latitude given to prosecutors to respond to that purported inference by pointing out that if the therapist would have been helpful to the defense, the defense could have subpoenaed him. Such a comment, refuting a purported inference, is not an impermissible shifting of the burden of proof." 293 Kan. at 64; see, *e.g.*, *State v. Verge*, 272 Kan. 501, 512-14, 34 P.3d 449 (2001) (prosecutor's comment on witness' availability and defense's subpoena power not impermissible burden shifting but reasonable response to defense argument that faulted State for failing to call witness); see also *State v. Baker*, 249 Kan. 431, 446-49, 819 P.2d 1173 (1991); *State v. Hanks*, 236 Kan. 524, Syl. ¶ 7, 694 P.2d 407 (1985); *State v. Robinson*, 219 Kan. 218, 221, 547 P.2d 335 (1976).

Likewise, more generally, this court has held a prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case. See, *e.g.*, *State v. Wilson*, 295 Kan. 605, 623-25, 289 P.3d 1082 (2012) (holding prosecutor's arguments that defendant had no explanation for his DNA found near crime scene did not improperly shift burden of proof; rather, it was comment on efficacy of defense and pointed jurors to lack of evidence supporting defendant's version of events); *State v. Cosby*, 293 Kan. 121, 135-37, 262 P.3d 285 (2011) (finding prosecutor's statements asking jury if it had heard any evidence that suggested witness' testimony was wrong did not improperly shift burden of proof because prosecutor was only commenting generally on defendant's failure to rebut witness' testimony and not commenting on defendant's failure to testify); *Duong*, 292 Kan. at 832-33 (holding prosecutor's arguments questioning defendant's failure to present evidence of misidentification did not improperly shift burden of proof because prosecutor did not call upon defense to disprove crime's occurrence but rather pointed out that evidence supporting defense theory was thin); *Stone*, 291 Kan. at 18 (finding prosecutor's statements that defendant had " 'obstacles to over-

come' " were within considerable latitude granted to prosecutors to comment on weaknesses of defenses).

In this case, the prosecutor's statements did not call upon the defense to disprove the occurrence of the crime. See *Tosh*, 278 Kan. at 92. Rather, the prosecutor responded to defense counsel's argument by recounting evidence regarding steps law enforcement officers took to verify the identity of the people L.M. talked about, most of whom she knew only by their nicknames or first names. Accordingly, the prosecutor's comments were not outside the wide latitude allowed in discussing evidence.

### APPRENDI/IVORY

Finally, Williams contends the district court's use of his prior convictions in his criminal history score to enhance his sentence without requiring the criminal history to be included in the complaint and proven to a jury beyond a reasonable doubt violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Williams acknowledges that this court has previously rejected this argument. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Williams has not presented a new or persuasive argument compelling us to overturn this precedent.

The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.