NOT DESIGNATED FOR PUBLICATION

No. 119,253

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES RAYMOND LAX-DUDLEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed November 8, 2019.
Convictions affirmed, sentence vacated, and case remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: James Lax-Dudley appeals following his convictions by a jury of
aggravated robbery, attempted aggravated robbery, conspiracy to commit aggravated
robbery, aggravated endangering of a child, and four counts of aggravated assault with a
deadly weapon. Lax-Dudley claims that (1) the prosecutor committed error during
closing argument by shifting the burden of proof to him on his alibi defense and (2) his
sentence was illegal given the improper classification of his prior 2008 federal bank
robbery conviction as a person felony. We reject Lax-Dudley's prosecutorial error claim
and affirm his convictions, but we remand for the district court to reevaluate the sentence.

1

FACTUAL AND PROCEDURAL BACKGROUND

On September 19, 2016, at 5:20 pm, Topeka Police Department (TPD) Patrol Officer Jason Oyler was dispatched to an attempted robbery call at Advance America. One of the Advance America employees, Davie Rivera, said he saw a man wearing a mask, black pants, and black hoodie approach the door with a gun and try to force it open. Rivera said he saw the man for a brief time as he was pulling down the ski mask and approaching the door. Another employee, Akil Buckley, said he also could see certain features of the man trying to rob the store because he pulled up his mask as he ran by the building. Buckley described the man as a black male with a full beard and a gun, who was wearing a black jacket with a white stripe.

At 6:29 p.m., Oyler was returning to the station when officers were dispatched to Family Dollar for a robbery. Elena Munoz was with her daughter and her 14-year-old grandson at the cash register in Family Dollar when the robber came inside. Elena ran out of the store, but her daughter and grandson stayed because the man pointed a gun at them. The cashier, Mickaela Escobar, told officers that a man entered the store, waived a gun around, demanded cash, took $300, and then left in a silver four-door Ford 500 with license plate 283 HHH.

The next day, TPD Detective Kent Biggs investigated a shoplifting at JCPenney. Biggs determined that there were three people involved: Tyrone Baggett, Melinda Schultz, and Semaj Jackson. Biggs interviewed Schultz at the police station about the JCPenney case but later began questioning her about the Family Dollar robbery because the vehicle in that robbery was like the car used at JCPenney. Biggs showed Schultz a picture from the Family Dollar's surveillance camera that showed a full body shot of the robber. Schultz seemed a bit surprised at first and then said that she knew the suspect. Schultz told Biggs that the suspect was "Tenzel's brother" and that he was at her house the day before, had borrowed a gun and some clothes from "O.G.," and then took

2

"O.G.'s" car. Biggs determined O.G. was Baggett. Biggs also knew Tenzel Dudley and obtained a photo of his brother, Lax-Dudley, which he showed to Schultz. Schultz stated that Lax-Dudley was the man in the surveillance photo from the Family Dollar.

Biggs then executed a search warrant at Baggett's house on Southeast Quincy Court to investigate the JCPenney shoplifting case, the Advance America attempted robbery, and the Family Dollar robbery. John Sanders, a TPD crime scene supervisor, helped execute the search warrant. Sanders stated that when he arrived at the house, there was a Ford 500 outside with tag number 283 HKH. Sanders also found two $CO_2$ air pistols, a .50-caliber semiautomatic pistol, and a Nike Air athletic jacket.

TPD Detective Jason Deutsch worked the Family Dollar and Advance America cases, which he believed were connected because of the similar suspect description in each case. Biggs emailed Deutsch about what he learned while investigating the shoplifting case, and Deutsch came to suspect that Jackson and Lax-Dudley committed the robberies. Deutsch also learned that when Biggs searched Baggett's house, he found a black and white Nike jacket and two $CO_2$ pistols. Based on this information, Deutsch created a photo array which was shown to Buckley on September 21, 2016. Buckley identified Lax-Dudley as the attempted robber at Advance America.

On September 22, 2016, Deutsch interviewed Lax-Dudley who at first stated that he was working at Denny's on the evening of September 19, 2016. But when Deutsch tried to confirm that information, he learned that Lax-Dudley did not start working at Denny's until September 20, 2016. When confronted with this fact, Lax-Dudley then told Deutsch that if he was not working at Denny's, he was at his dad's house.

On September 27, 2016, the State charged Lax-Dudley with aggravated robbery, attempted aggravated robbery, aggravated endangering of a child, and four counts of

aggravated assault with a deadly weapon. The State later amended the complaint to add a count of conspiracy to commit aggravated robbery.

On February 20, 2017, Deutsch interviewed Jackson at the law enforcement center. Jackson told Deutsch that on September 19, 2016, he was with Lax-Dudley in Baggett's silver Ford or Toyota when they drove to Advance America and Lax-Dudley tried to rob it. Jackson stated that he tried to stop Lax-Dudley from trying to rob another place, but Lax-Dudley said he was not going back without any money, so they went to the Family Dollar and Lax-Dudley robbed it. Jackson stated that Lax-Dudley had a $CO_2$ pistol, a mask, and was wearing a black and white Nike jacket that used to belong to him.

The district court held a jury trial on August 22-25, 2017. At trial, the State called Rivera, Buckley, and Brian Wiexelman, a customer who was in Advance America, to testify as to what occurred there on September 19, 2016. Each witness described the robber as a man carrying a pistol and wearing a mask, a black jacket, and black pants.

The State also called Elena, her grandson, and her daughter, who testified to the events at Family Dollar. Each witness testified that they were scared because a man wearing black clothing and a mask threatened to shoot them. Elena's grandson testified that the man shot the gun when he was talking to the cashier but the only thing that came out was air. Two Family Dollar employees, Escobar and Jamie Sutton, both testified to seeing a man wearing all black and a mask enter the store with a gun and demand money. Both Escobar and Sutton testified that they were scared and the man shot the gun. Escobar testified that when the man left, she jumped over the register to lock the door and shouted out the license plate of the robber's car for her coworker to write down.

Schultz testified that in September 2016 she lived at Baggett's house with her boyfriend, Jackson. Shultz stated that on September 19, 2016, she saw Lax-Dudley at Baggett's house around 3 p.m. and he and Baggett went into Baggett's bedroom for about

4

an hour. She testified that when they came out of the bedroom, Lax-Dudley was wearing a black and white Nike sweatshirt she had given to Jackson and that Jackson and Lax-Dudley got into Baggett's four-door silver Ford. Schultz stated that the two men left around 4:30 p.m. and returned around 7 p.m. She stated that when the men returned, Lax-Dudley talked with Baggett in the bedroom again and then left without the Nike jacket. Schultz also testified that she went to JCPenney the next day to steal Nike shoes for Baggett and was arrested. She testified that the State agreed to recommend probation for the JCPenney case in exchange for her testimony against Lax-Dudley. On cross-examination, she testified that she had used methamphetamine on September 19, 2016, about an hour or two before seeing Lax-Dudley, but it did not affect her memory of the events on that date.

Jackson testified that he saw Lax-Dudley on September 19, 2016, at Baggett's house and that Lax-Dudley and Baggett went into the bedroom for 20-30 minutes. He testified that when Lax-Dudley came out of the bedroom, he was carrying the black and white Nike jacket that Jackson had sold to Baggett two days earlier. Jackson testified that Baggett asked him to go with Lax-Dudley to make sure his car came back, so he went with Lax-Dudley in Baggett's four-door grey Ford. Jackson testified that Lax-Dudley first drove to Advance America. Once there, Jackson went up to the door and asked if they had a restroom; he was told they did not, so he used the restroom on the side of a nearby apartment building. When he returned to the car, Lax-Dudley was wearing a beanie, which turned into a ski mask, and he was carrying a CO2 pistol. He testified that he saw Lax-Dudley approach Advance America and pull the mask over his face. When Lax-Dudley returned, he told Jackson that Advance America was closed.

Jackson testified that Lax-Dudley then drove them around for a while. He told Lax-Dudley he wanted to go back to the house, but Lax-Dudley said they were not going back without any money. He then testified that Lax-Dudley backed the car into the Family Dollar parking lot, put on the ski mask, took the gun, and went inside the store for

20-25 minutes. Jackson testified that when Lax-Dudley came out of the store and jumped in the car to leave, he saw money in Lax-Dudley's hand. Jackson testified that he was charged with the same crimes as Lax-Dudley, but his charges would be reduced to conspiracy if he testified at trial. Jackson also testified that he used methamphetamine on September 19, 2016, about 30 minutes before the robberies.

In his case-in-chief, Lax-Dudley presented an alibi defense and called his stepfather, Terry Dudley. Dudley testified that he was self-employed and did various jobs, including cutting lawns and tree limbs and hauling debris. Dudley testified that September 19, 2016, was the first day that he had contact with Lax-Dudley for some period. Dudley testified that Lax-Dudley was with him when he began working that morning and helped him the whole day.

On cross-examination, Dudley was confused about the number of lawns he mowed that day, but he eventually said he mowed four lawns. Dudley said that he could not remember the order in which he mowed the four lawns, but he stated that he mowed the lawn of a French restaurant on 17th Street, a lawn on Story Street, and two other lawns further down Story Street. Dudley testified that a man named John paid him for mowing the lawn of the French restaurant. He also testified that Walt Schreiner owned one of the houses on Story Street. Dudley stated that Schreiner was present while he mowed the lawn. Even though Schreiner is blind, Dudley testified that Schreiner would have known Lax-Dudley was there because Dudley always introduces his help to Schreiner.

The State called Deutsch as a rebuttal witness who testified that he had tried to contact Dudley after discovering that Lax-Dudley was asserting an alibi defense, but he could not get ahold of him. He testified that he would have tried to corroborate Dudley's testimony by speaking to the individuals at the places Dudley claimed to be on September 19, 2016, had Dudley given him the information. During closing argument, the State pointed out that Dudley's alibi testimony was not corroborated by any other witnesses.

6

The jury found Lax-Dudley guilty of all charges. At the sentencing hearing on January 24, 2018, the presentence investigation (PSI) report showed Lax-Dudley had a criminal history score of A, to which Lax-Dudley did not object. The PSI report showed that Lax-Dudley was convicted of bank robbery in the United States District Court of Kansas in 2008, but it did not indicate the statute or subsection under which the bank robbery charge was brought. The district court sentenced Lax-Dudley to 288 months' imprisonment and 36 months' postrelease supervision. Lax-Dudley timely appealed.

PROSECUTORIAL ERROR CLAIM

Lax-Dudley claims the State committed prosecutorial error during its closing argument by impermissibly shifting the burden of proof to him by commenting on his lack of corroborating witnesses for his alibi defense. More specifically, Lax-Dudley argues that the prosecutor erred by stating:  "[I]f this alibi is true, it could be corroborated. And, all the evidence you have is Mr. Dudley's testimony." The State argues that the prosecutor was making a fair comment that Dudley's testimony was not credible and that there was no other evidence to support the alibi. The State argues that the statement was simply pointing out the weaknesses in Lax-Dudley's defense.

An appellate court's review of a claim of prosecutorial error involves a two-step process:  consideration of error and consideration of prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In considering whether error has occurred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. If the appellate court finds error, then "the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial" using the constitutional harmless error inquiry. 305 Kan. at 109.

7

The allegedly improper statement here occurred during the State's rebuttal closing. The State started to discuss Dudley's credibility before Lax-Dudley's counsel objected raising the burden of proof argument:

> "Okay, so the defendant's step-father, Mr. Terry Dudley, has testified in this case. And, he has told us some things about the defendant's whereabouts and I would suggest that if you look at all the evidence together and you consider his testimony that is not credible, for a couple of reasons. The first is that Mr. Dudley's testimony establishes that on the 19th, about three days before the defendant is interviewed on this matter he was with his son starting from 6a.m. to 7p.m. doing 13 hours of hard manual labor including mowing lawns and clearing logs, heavy logs. According to Mr. Dudley, he was happy that Mr. Lax was there to help lift the heavy logs. According to Mr. Dudley this would have been witnessed by people who are not in the defendant's family including a man named John who paid Mr. Dudley or saw Mr. Dudley at the French restaurant, one of the places that he went. Also Matt Schreiner who also would have seen Mr. Lax and Mr. Dudley together doing work on the houses on Story, and these people you have not heard from—
> "MR. CONWELL:—Objection."

After hearing each side's position, the district court overruled the objection but cautioned the State to be careful because Lax-Dudley did not have to prove anything. The State then resumed its rebuttal closing stating:

> "As I said in the beginning, the defendant is not required to prove that he is innocent. He is not required to prove this alibi. But the alibi he has presented is from his stepfather, the man who has raised him as a father since he was three years old. And when you consider that testimony, you can consider that as a potential bias. You can consider the fact that fathers love their sons and want to care for them and take care of them, and perhaps when you interpret the evidence in this case, the most reasonable interpretation is Terry Dudley came here to help his son out and if that meant saying something that was a mistake, perhaps he would've said that. It also means perhaps Mr. Dudley was willing to say something that was not true at all. *But the point is, if this alibi is true, it could be corroborated. And, all the evidence that you have is Mr. Dudley's testimony*." (Emphasis added.)

8

A prosecutor may not shift the burden of proof to the defendant. *State v. Pribble*, 304 Kan. 824, 837, 375 P.3d 966 (2016). But our Supreme Court has held that a prosecutor pointing out a lack of evidence to support a defense does not constitute burden shifting. *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014). More to the point, Kansas courts have found that comments on the lack of support for an alibi theory do not constitute impermissible burden shifting. See, e.g., *Pribble*, 304 Kan. at 838 ("[T]he prosecutor did not improperly shift the burden of proof when he commented about Pribble's failure to call [four other] alibi witnesses who could have corroborated his theory of the case, i.e., that he was out of town when the drugs came into his house."); *State v. Mims*, 222 Kan. 335, 337, 564 P.2d 531 (1977) (finding no error in the prosecution's comment on defendant's failure to produce additional witnesses to support his alibi defense given that there were allegedly other people in his company at the time and the defendant made no attempt to contact them).

In *State v. Todd*, 299 Kan. 263, 286, 323 P.3d 829 (2014), the Kansas Supreme Court examined a similar argument when the defendant alleged that the prosecution impermissibly shifted the burden of proof by stating that there was no corroboration for the alibi witness' testimony and that the alibi witness was not credible. In that case, the prosecutor made these remarks during closing and rebuttal closing:

> "'If [the alibi witness'] testimony failed, then all the alibi defense failed. You can find from the evidence that her testimony did fail. . . .
>
>     . . . .
>
> "'If [the alibi witness] is coming here to provide compelling evidence from—about a relative of hers that she feels deeply for, and it's a relevant question, where is other corroboration about that?
>
>     "'Much like what the State showed you in terms of corroboration from its witnesses. . . . [W]e talked about how she must have known these things for two, two and a half years and didn't go banging on every door possible to tell the authorities, hey, you have the wrong guy.'" 299 Kan. at 268-69.

9

The *Todd* court found that the statements did not shift the burden of proof because "[t]he prosecutor certainly was permitted to poke holes in the defense's alibi theory during cross-examination, and, by extension, during closing argument." 299 Kan. at 286.

Here, the prosecutor's statement, when read in context, did not constitute burden shifting. Instead, the statement represented a permissible comment on the weaknesses of Lax-Dudley's alibi defense. The prosecutor argued that aside from Dudley's potentially biased testimony, there was no other evidence to support Lax-Dudley's alibi defense. Based on our Supreme Court's holdings in *Pribble*, *Todd*, and *Mims*, we conclude the prosecutor's statement here did not fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction. Because there was no prosecutorial error, we need not address the prejudice prong under the *Sherman* standard of review. See 305 Kan. at 109.

SENTENCING CLAIM

Lax-Dudley also claims the district court erred by classifying his 2008 federal bank robbery conviction as a person felony when calculating his criminal history score. First, Lax-Dudley argues that the district court should have applied the "identical to or narrower than" comparable offense test in *State v. Wetrich*, 307 Kan. 552, 412 P.3d 984 (2018), when determining whether the conviction was a person or nonperson crime. Second, he argues that the federal bank robbery statute, 18 U.S.C. § 2113 (2002), is a divisible statute—providing at least three versions of the crime—and the district court erred when it did not determine which version Lax-Dudley was convicted under before classifying his conviction. Lax-Dudley argues that the case should be remanded to the district court to redetermine his criminal history score recognizing the divisible statute and using *Wetrich*'s "identical to or narrower than" comparable offense test.

10

The State argues that *Wetrich* does not apply because the legality of a sentence is controlled by the law in effect when the sentence is pronounced. The State argues that the district court did not err because the federal bank robbery statute and the Kansas robbery statute are comparable under the comparable offense test outlined in *State v. Vandervort*, 276 Kan. 164, 179, 72 P.3d 925 (2003), the test in effect at the time of Lax-Dudley's sentencing. In the alternative, the State concedes that if the district court erred, the case should be remanded to determine under which section of the federal bank robbery statute Lax-Dudley was convicted.

Lax-Dudley can raise this issue for the first time on appeal because, assuming the appellate court otherwise has jurisdiction, an incorrect criminal history score results in an illegal sentence, which the court may correct at any time. See K.S.A. 2018 Supp. 22-3504(1); *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015). Classification of prior convictions for criminal history purposes involves interpretation of the Kansas Sentencing Guidelines Act (KSGA). *Wetrich*, 307 Kan. at 555. Statutory interpretation is a question of law subject to unlimited review. 307 Kan. at 555. Under the KSGA:

> "(1) Out-of-state convictions and juvenile adjudications shall be used in classifying the offender's criminal history.
> "(2) An out-of-state crime will be classified as either a felony or a misdemeanor according to the convicting jurisdiction:
> . . . .
> "(3) The state of Kansas shall classify the crime as person or nonperson. *In designating a crime as person or nonperson, comparable offenses under the Kansas criminal code in effect on the date the current crime of conviction was committed shall be referred to.* If the state of Kansas does not have a comparable offense in effect on the date the current crime of conviction was committed, the out-of-state conviction shall be classified as a nonperson crime.
> "(4) *Convictions* or adjudications *occurring within the federal system . . . are considered out-of-state convictions* or adjudications." K.S.A. 2016 Supp. 21-6811(e) (Emphases added.)

11

We note that the 2019 Kansas Legislature amended K.S.A. 21-6811. L. 2019, ch. 59, § 13. But the Legislature did not express any intent that the 2019 amendment to this section shall be construed and applied retroactively. Neither party has argued that the 2019 amendment to K.S.A. 21-6811 applies to Lax-Dudley's case, so we will not address the amendment in this opinion.

When Lax-Dudley was sentenced in January 2018, Kansas interpreted the "comparable offense" language in K.S.A. 2016 Supp. 21-6811(e) to mean that the Kansas offense need not be identical to the out-of-state crime but must be the closest approximation to it. *Vandervort*, 276 Kan. at 179. But in March 2018, the Kansas Supreme Court determined that the proper interpretation of "comparable offense" was that "the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." *Wetrich*, 307 Kan. at 562.

The State incorrectly argues that the holding in *Wetrich* does not apply here. In recent opinions, our Supreme Court has made it clear that the holding in *Wetrich* applies if a defendant's direct appeal was pending when *Wetrich* was decided. *State v. Murdock*, 309 Kan. 585, 591-92, 439 P.3d 307 (2019); *State v. Obregon*, 309 Kan. 1267, 1271, 444 P.3d 331, 335 (2019); *State v. Ewing*, 310 Kan. 348, 352, 446 P.3d 463, 467 (2019). Here, the district court sentenced Lax-Dudley on January 24, 2018. He timely filed his notice of appeal on January 31, 2018. *Wetrich* announced the "identical to or narrower than" comparable offense test on March 9, 2018, while Lax-Dudley's direct appeal was pending before this court. Thus, *Wetrich* enumerates the proper comparable offense test to be used in classifying Lax-Dudley's federal bank robbery conviction.

*The federal bank robbery statute is divisible*

*Wetrich* requires an elemental comparison of the out-of-state conviction and the comparable Kansas crime for criminal history purposes. See 307 Kan. at 562 ("In other

words, the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced."). Thus, before engaging in the identical to or narrower than analysis, a district court must determine the elements of the out-of-state conviction. Lax-Dudley's argues that because the federal bank robbery statute is divisible, the district court erred in not first determining under which subsection he was convicted before determining that the offense was a person felony.

A divisible statute is one that lists "elements in the alternative, and thereby define[s] multiple crimes." *Mathis v. United States*, 579 U.S. ___, 136 S. Ct. 2243, 2249, 195 L. Ed. 2d 604 (2016). The federal bank robbery statute, 18 U.S.C. § 2113 (2002), states:

> "(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
>
> "Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—
>
> "Shall be fined under this title or imprisoned not more than twenty years, or both.
>
> "(b) Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than ten years, or both; or
>
> "Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value not exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings

13

and loan association, shall be fined under this title or imprisoned not more than one year, or both.

"(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value which has been taken or stolen from a bank, credit union, or savings and loan association in violation of subsection (b), knowing the same to be property which has been stolen shall be subject to the punishment provided in subsection (b) for the taker."

Lax-Dudley correctly argues that the federal bank robbery statute is divisible. The first paragraph contains two separate crimes of bank robbery and bank extortion. *State v. Baert*, No. 119,241, 2019 WL 4551638, at *7 (Kan. App. 2019) (unpublished opinion), *petition for rev. filed* October 21, 2019; see *United States v. Watson*, 881 F.3d 782, 786 (9th Cir.), *cert. denied* 139 S. Ct. 203 (2018). The second paragraph then contains another version of the crime:  entering a bank intending to commit larceny or a felony. *Baert*, 2019 WL 4551638, at *7; see *United States v. McBride*, 826 F.3d 293, 296 (6th Cir. 2016) ("Section 2113(a) seems to contain a divisible set of elements, only some of which constitute violent felonies—taking property from a bank by force and violence, or intimidation, or extortion on one hand and entering a bank intending to commit any felony affecting it [e.g., such as mortgage fraud] on the other."); *United States v. McGuire*, 678 Fed. Appx. 643, 645 n.4 (10th Cir. 2017) (unpublished opinion). The State does not dispute that the federal bank robbery statute is divisible.

Because the federal bank robbery statute is divisible, the district court must determine which subsection Lax-Dudley was convicted under to know what the elements are for the *Wetrich* analysis. This analysis is known as the "modified categorical approach" and allows examination of "charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms" to determine which statutory phrase was the basis for conviction. *Obregon*, 309 Kan. at 1274 (quoting *Johnson v. United States*, 559 U.S. 133, 144, 130 S. Ct. 1265, 176 L. Ed. 2d 1 [2010]).

Here, the PSI report is the only document in the record discussing the prior conviction for federal bank robbery and it does not show under which subsection of 18 U.S.C. § 2113 Lax-Dudley was convicted, and if it was under subsection (a), it does not state which theory he was convicted of—bank robbery, bank extortion, or entering a bank to commit a felony. Without this determination, the classification of his federal bank robbery conviction as a person felony is erroneous.

Thus, as both parties concede, remand is necessary for the district court to apply the modified categorical approach and examine the limited class of documents to determine under which subsection of the federal bank robbery statute Lax-Dudley was convicted. The burden will be on the State to prove which subsection Lax-Dudley was convicted under and to show that the subsection satisfies the *Wetrich* "identical to or narrower than" test. Otherwise, the conviction must be scored as a nonperson felony.

Convictions affirmed, sentence vacated, and case remanded with directions.