IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,993

STATE OF KANSAS,
*Appellee*,

v.

ANDREW LYNN GIBSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 74-5323(a) provides that the confidential relations and communications between a licensed psychologist and the psychologist's client "are placed on the same basis as provided by law for those between an attorney and the attorney's client."

2.

K.S.A. 60-437(b) provides that a person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if a judge finds such person or any other person while the holder of the privilege without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone.

3.

An appellate court reviews a district court's determination that a party waived a psychologist-client privilege under an abuse of discretion standard.

4.

A trial judge's jury instruction that states, "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty," is legally appropriate.

5.

A sentencing court has no authority to order a term of lifetime postrelease supervision along with an off-grid, indeterminate life sentence.

Appeal from Riley District Court; RICHARD M. SMITH, judge. Opinion filed July 2, 2020. Affirmed in part and vacated in part.

*Christina M. Kerls*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  In this direct appeal, Andrew Gibson challenges his convictions of child abuse and felony murder with the underlying felony of child abuse. He asserts those convictions should be reversed because:  (1) the trial court erred when it held he waived a privileged communication with a defense-hired psychologist; (2) the evidence cannot support the convictions; (3) the jury instruction on the State's burden of proof improperly discouraged the jury from exercising its nullification power; and (4) these errors cumulatively denied him a fair trial. He also raises a sentencing issue, arguing the court improperly imposed lifetime postrelease supervision instead of lifetime parole. We affirm his convictions and vacate the lifetime postrelease supervision.

FACTUAL AND PROCEDURAL BACKGROUND

S.N.R., a three-month-old baby girl, died in 2016, from asphyxiation. Her mother left her with Gibson while she was out of town for the day. According to the mother, S.N.R. was in good health when she left.

A timeline of Gibson's activities that day was created using his cell phone records, receipts, and records from his video game activities. Throughout the day, mother and Gibson communicated by Snapchat or text. At 4:47 p.m., Gibson sent mother a picture of himself and S.N.R. lying on the couch. Shortly after that, he ordered pizza for dinner and played a video game from 5:42 p.m. to 9:11 p.m. Later, he discovered S.N.R. was not breathing and called 911. That call was at 9:18 p.m.

A responding police officer found Gibson crying and kneeling in the dining area with S.N.R. on her back on the floor. The officer described the infant as "extremely pale," her nose and cheeks appeared to have "like a carpet burn," and she had "a little bit of a bruising over her left eyelid." She was pronounced dead at a hospital shortly after arrival.

Police interviewed Gibson several times. Officers on the scene asked him about the incident. He explained he laid S.N.R. down for a nap around 7:30 p.m. and checked her every 20-30 minutes with the last time being around 9 p.m., when he saw her moving. He said when he went to wake her up a little later, he saw she was not breathing and her face was "all weird." Later that night, Detective Julia Goggins interviewed him at the police station and he provided essentially the same version of events with only minor variations in his time estimates.

The next day, Detective Brian Johnson interviewed Gibson twice at the police station. The first lasted until Gibson said he wanted to stop. He was taken to booking,

3

where he told jail personnel he wanted to talk to Johnson again. This time, Gibson provided a new version of events: he fell asleep with the baby in the bedroom; she woke him up and he got upset; without even knowing what he was doing he pushed her head against the bed; once aware of what he was doing, he released her and cradled her; he put her in the play pen and let her sleep more; and later, he found the baby not breathing so he dialed 911.

The State charged Gibson with first-degree felony murder and child abuse. He was tried first in early 2018, resulting in a hung-jury mistrial. He was retried in May and a jury convicted him as charged. The court sentenced him to a hard 25 sentence for felony murder and a consecutive, 34-month prison term for child abuse. The court imposed lifetime postrelease supervision.

### THE PSYCHOLOGIST-CLIENT PRIVILEGE WAIVER

Gibson challenges the district court's decision during the second trial to allow the State to present evidence about his interview with a defense-retained psychologist, Dr. Jarrod Steffen. Gibson claims his discussions with Dr. Steffen were privileged. The State argues Gibson waived any privilege.

*Additional facts*

Before the first trial, defense counsel arranged for a forensic psychological evaluation to provide, as Dr. Steffen explained, "a diagnostic assessment of Mr. Gibson and an appraisal of his psychological functioning in view of mitigation for his legal case." In his report, Dr. Steffen determined: "Mr. Gibson's functioning . . . in the time period leading up to and encompassing [S.N.R.'s death] and continuing to the present, has been characterized by comorbid psychiatric conditions of PTSD and Major Depressive

4

Disorder and an underlying maladaptive personality structure in the form of Borderline Personality Disorder."

In preparing this evaluation, Dr. Steffen considered a clinical interview he had with Gibson while in jail. Before beginning that interview, he advised Gibson of the "limitations on confidentiality" and "foreseeable uses of information from the evaluation." Defense counsel gave Dr. Steffen's report to a defense pathologist, Dr. Lyle Noordhoek, and to the State.

Neither side called Dr. Steffen as a witness during the first trial, but the State did for the second one. Before his testimony, the court and parties had a conference about it during which defense counsel agreed any privilege with Dr. Steffen was "waived in regards to the report that was provided to the prosecution because it was provided to Dr. Noordhoek in his review of the case." But the defense also argued anything Gibson told Dr. Steffen that was not recited in the report remained privileged. The State countered that any communication between the two was no longer privileged once defense counsel disclosed the report. It specifically noted it intended to ask Dr. Steffen what Gibson said about smothering the baby, which was not in the report.

The court found there was a knowing and voluntary waiver of the privilege, based on K.S.A. 60-437(b) and *State v. Johnson*, 223 Kan. 237, 573 P.2d 994 (1977). It ruled Dr. Steffen could testify "to anything the defendant said" during the clinical interview. The court allowed defense counsel to "have a continuing objection to everything that doctor testifies to that's not in the report . . . [regardless of whether counsel] actually stand up and make those objection."

Dr. Steffen testified that in interviewing Gibson, "the goal was to obtain a picture, an assessment, of [Gibson's] overall functioning as it relates to any type of mental

5

conditions *and his involvement in the case*." (Emphasis added.) The following colloquy occurred:

> "Q: What did [Gibson] tell you happened to [S.N.R.]?
>
> "A: If I could refer to my notes.
>
> "Q: Yes.
>
> "A: He said that he had laid [S.N.R.] in bed and that he had laid down as well. He took a nap with her while the other kids were playing video games, and he had a nightmare. That he didn't remember the content of the nightmare, what it was about, but that the nightmare was scary, frightening, and he remembered being angry in the nightmare, those were his different terms, and he woke up from the nightmare, but before he—well, when he came to or became aware of his surroundings, he had been holding [S.N.R.]'s face down on the bed.
>
> "He was holding her head face down onto the bed which he estimated was 20 to 30 seconds, and she was crying when he came to, and when he realized what he was doing, he let go and cradled her to quiet her—to help her quit crying, and then she did and he put her in the play pen, and then he went out to the living room with the other kids."

Dr. Steffen said Gibson's statement was responsive to him asking, "What happened?" On recross-examination, he explained in greater detail how that statement was prompted:

> "Q: Do you have specifically in your notes that that's which question you specifically asked?

6

"A: In looking at my notes closer, when I asked him, essentially tell me what was going on in the days and weeks before she died, he went into a free narrative and relayed that information, and then in response to follow-up questions or actually prompts, what happened then, that was after he told me what had happened, *he began talking about speaking with the police and in that he had mentioned that he had told the detective about his mistake and I said, what do you mean mistake, and he said the exact same thing I told you.*

"I had not heard a mistake at that point and in his free recall, he hadn't mentioned pushing her head into the bed and so *I said, well, what exactly is the mistake that you told the detective, and then that's what he had told me.* And then I asked him, well, what were your thoughts going on at the time and then how did that stop, and then what happened." (Emphases added.)

*Preservation*

The State claims this issue is not properly preserved for appellate review because Gibson "limited his objection to conversations not contained in Dr. Steffen's report. But [the] report discussed conversations with [him] regarding 'disturbing dreams' and 'stress' and 'impulsive behavior.'" The State contends the conversations were implicitly included in the report with no objection lodged. At trial, though, the State told the court the conversations were not in the report, so it appears the State's position shifted on appeal. Even so, when the court allowed defense counsel to have a continuing objection, it clarified, "Let's preserve this issue so we don't have a question about whether or not [defense] objected appropriately for purposes of appeal."

We hold the issue is properly preserved. The district court heard the parties' arguments and ruled on them. See *State v. Randle*, 311 Kan. __, 462 P.3d 624, 634 (2020) (noting trial court knew the issue and had a chance to rule on it; holding the issue was preserved for appellate review).

7

*Standard of review*

An appellate court assesses whether a party waived a psychologist-client privilege under an abuse of discretion standard. See K.S.A. 74-5323(a) (communications between licensed psychologist and client have same basis as provided by law for an attorney and the attorney's client); *State v. Spears*, 246 Kan. 283, 288, 788 P.2d 261 (1990) (review of attorney-client privilege). "A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact." *State v. Frazier*, 311 Kan. __, 461 P.3d 43, 46 (2020). To the extent this appeal involves statutory interpretation, appellate courts exercise unlimited review. *State v. Downing*, 311 Kan. 100, 103, 456 P.3d 535 (2020).

*Discussion*

The parties share little agreement on this issue. First, they dispute which statute established the confidential relationship. Second, they disagree about what statute applies to the alleged waiver.

As to the privilege, Gibson argues K.S.A. 65-5810(a)-(b) does that, while the State contends K.S.A. 74-5323(a) does. The practical effect appears the same, since both statutes provide the "confidential relations and communications" between a professional and the client "are placed on the same basis as provided by law for those between an attorney and an attorney's client." K.S.A. 65-5810; K.S.A. 74-5323. But the statute Gibson looks to applies to communications with "licensed professional counselor[s]" and [licensed clinical professional counselor[s]," By contrast, K.S.A. 74-5323(a) provides: "The confidential relations and communications between *a licensed psychologist* and the

8

psychologist's client are placed on the same basis as provided by law for those between an attorney and the attorney's client. . . ." (Emphasis added.)

K.S.A. 74-5323(a) is the applicable statute. Dr. Steffen, a licensed psychologist, received a doctoral degree in clinical psychology. And he was hired, as he testified, to conduct a psychological evaluation to determine Gibson's "psychological functioning in view of mitigation for his legal case," not to provide counseling services. See K.S.A. 65-5802(b) ("'Practice of professional counseling' means assisting an individual or group . . . through counseling, assessment, consultation and referral and includes the diagnosis and treatment of mental disorders . . . ."), (c) ("'Professional counseling' means to assist an individual or group to develop understanding of personal strengths and weaknesses, to restructure concepts and feelings, to define goals and to plan actions as these are related to personal, social, educational and career development and adjustment."). Any privilege claim must flow through K.S.A. 74-5323.

Next, the parties disagree about which statute applies to decide Gibson's alleged waiver. The district court ruled based on K.S.A. 60-437. It provides:

"A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has (a) contracted with a party against whom the privilege is claimed that he or she would not claim the privilege or, (b) *without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter* or consented to such a disclosure made by anyone." (Emphasis added.)

Gibson relies on *State v. Foster*, 259 Kan. 198, 210, 910 P.2d 848 (1996). He insists the defense had not presented evidence of communications between Dr. Steffen

9

and Gibson prior to Dr. Steffen testifying, so under his view of *Foster*, the report itself remained privileged despite its disclosure.

But Gibson's reasoning is flawed. His trial counsel conceded the report was no longer privileged because another testifying defense expert used it, so Gibson cannot make this new argument on appeal. See *State v. Williams*, 298 Kan. 1075, 1084, 319 P.3d 528 (2014) (issue not asserted below cannot be raised on appeal); Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) (party briefing an issue on appeal must refer to the specific location in the record on appeal where the issue was raised and ruled upon; if the issue was not raised below, there must be an explanation why it is properly before the court).

More substantively, his case is easily distinguishable from *Foster*. There, the court held a prosecutor committed misconduct by asking the defendant about statements made during a psychological evaluation to determine sanity. *Foster*, 259 Kan. at 210-12. That evaluation was subject to mandatory disclosure under K.S.A. 22-3219(2). But in Gibson's case, as he concedes, his trial counsel believed disclosure was necessary because another defense expert had reviewed the report in arriving at his opinions, so counsel gave it to the State.

Gibson characterizes this disclosure as a mistake, but that does not change the fact that it was done knowingly and voluntarily as the district court found. See K.S.A. 2019 Supp. 22-3212(c)(2) ("[T]he defense shall . . . provide for the attorney for the prosecution a summary or written report of what any expert witness intends to testify, including the witness' qualifications and the witness' opinions . . . ."). And Gibson is not challenging that finding by the district court, so on appeal we consider it conclusive and any contrary argument waived. See *State v. Sanchez-Loredo*, 294 Kan. 50, 54, 272 P.3d 34 (2012) (matter not raised for review considered abandoned).

10

For the first time on this appeal, Gibson asserts K.S.A. 2019 Supp. 60-426a(a) governs this issue. That statute provides:

> "Disclosure made in a court or agency proceeding; scope of waiver. When the disclosure is made in a court or agency proceeding and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in any proceeding only if:
>
> (1) The waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness be considered together." K.S.A. 60-426a(a).

But neither party asked the district court to consider K.S.A. 60-426a(a), so that avenue of attack is not preserved. See *Williams*, 298 Kan. 1075, Syl. ¶ 4.

For these reasons, the district court did not err by allowing Dr. Steffen to testify to Gibson's statement made during the interview under K.S.A. 60-437(b).

SUFFICIENCY OF THE EVIDENCE

Gibson does not challenge whether the evidence was sufficient to show he was the person who suffocated S.N.R. and caused her death. Instead, he claims the proof could not show his action was *knowingly* done and *cruel* as required by K.S.A. 2019 Supp. 21-5602(a)(3) (child abuse "is knowingly . . . inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years"). The State counters that Gibson's

11

interview with Detective Johnson and the physical injuries to the child provide sufficient proof for both.

*Additional facts*

S.N.R.'s autopsy showed abrasions and contusions on her cheeks, nose, and eyes. She also had a "small abraded contusion [on her frenulum,]" an area attached to inside one's upper lip. Lividity patterns on her knees were consistent with a blanket pattern, suggesting she would have been dead on the blanket for at least an hour for those patterns to form. Her cause of death was asphyxiation by suffocation from forced pressure applied to the back of her head and neck.

The State claims Gibson's statement to Detective Johnson that "'I know I did it'" permitted the jury to conclude his conduct was knowing. Gibson stated during the following conversation with Johnson:

"Q: Where was her blanket? Was it in the crib the whole time?

"A: I put her in the crib with the same blanket she had on the bed.

"Q: Where were you holding when you held her against the bed?

"A: I am not even sure *I just know that I did it* when it's she woke me up. I hadn't slept the night before, like, that day I kept in and outing everything but I was trying to stay awake so I could watch the kids. That was the first time I fell asleep all day." (Emphasis added.)

At the first trial, Gibson portrayed his previous statements to the officers at the scene and during his interview with Detective Goggins as the accurate reflection of what happened. He testified he told Detective Johnson about pushing the baby's face down

12

because he "felt really guilty . . . I was the only adult there, and [S.N.R.] was my responsibility." He said "the only way I thought I could get back home was if I told the detective what he wanted to hear. . . . He kept asking me what I pushed her head against, kept telling me. When I told him I didn't do it, he kept telling me I did." He said he thought if he admitted to Detective Johnson's version of events, he could go home.

At the second trial, Gibson's testimony did not change. He added that after everyone ate pizza, he cleaned up the other two children he was watching and fed S.N.R. He then took her to the bedroom, put her in the play pen, and played a video game in the living room while the boys played with their toys and Wii games. Around 9 p.m., he took the boys to the bedroom and let them watch a television for 30 minutes. He went to wake S.N.R. up from her nap. He found she was not breathing or moving, so he promptly called 911.

*Standard of review*

"To meet the sufficiency standard, evidence must support each element of a crime. When challenged, an appellate court reviews the evidence's sufficiency by '"looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt."' 'In doing so, the appellate court generally will "not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. [Citations omitted.]"'" *State v. Parker*, 309 Kan. 1, 13-14, 430 P.3d 975 (2018).

*Discussion*

Due process demands the State prove every element of the charged offense. *State v. Patterson*, 311 Kan. 59, 62, 455 P.3d 792 (2020). Gibson was charged with and convicted of both felony murder and child abuse. The felony-murder statute did not require the State to show the killing itself was committed knowingly, but it did require

13

the State to show the murder was done while Gibson was committing the crime of child abuse. See K.S.A. 2019 Supp. 21-5402(a)(2) ("Murder in the first degree is the killing of a human being committed . . . in the commission of . . . any inherently dangerous felony."). And to prove child abuse, the State had to establish Gibson "*knowingly* . . . inflict[ed] *cruel* and inhuman corporal punishment upon [S.N.R.]" (Emphasis added.) K.S.A. 2019 Supp. 21-5602(a)(3).

Gibson argues the State failed to prove beyond a reasonable doubt that he knowingly inflicted cruel and inhuman corporal punishment on the baby. In his view, to find he acted knowingly, "the jury would have had to have engaged in impermissible inference stacking." In making this argument, Gibson relies on portions of his interview with Detective Johnson, during which he said he had the baby in the bed with him, fell asleep, woke up from her heavy crying, and "without even knowing" what he was doing he pushed her face into the mattress, and held her down "for not even a minute." He asserts he was unaware of the nature of his conduct when pushing the baby's face into the mattress.

He also attacks the State's theory about what happened: Gibson was in the living room, wanting to play video games; S.N.R. wanted attention; and he got angry when she would not calm down and pushed her face into the couch. He insists that to believe this would require the jury again to stack inference upon inference. See *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017) ("Where the State relies on such inference stacking, *i.e.*, where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence.").

Under our standard of review, we look at all the evidence in a light most favorable to the prosecution and determine whether a rational fact-finder could have found Gibson guilty beyond a reasonable doubt. We begin that task by acknowledging the evidence is

14

circumstantial, although that is not fatal to a successful prosecution. *State v. Hupp*, 248 Kan. 644, Syl. ¶ 5, 809 P.2d 1207 (1991) ("It has long been the rule of this court that a conviction of even the gravest offense may be sustained by circumstantial evidence."); see also *State v. Anderson*, 308 Kan. 1251, 1265, 427 P.3d 847 (2018) (same).

> "Intent is usually proven by inference arising from circumstantial evidence because direct evidence of a defendant's state of mind is rarely available. And when that is the case, the question becomes whether the circumstantial evidence is substantial or sufficient enough to sustain the conviction. We have held that circumstantial evidence '"need not rise to that degree of certainty which will exclude any and every other reasonable conclusion."' 'But mere suspicion, however strong, is not enough and juries are not permitted to base verdicts of conviction on suspicion.'

> "An appellate court must determine whether the circumstances themselves are proved or inferred from other circumstances when a conviction is wholly based on circumstantial evidence. And a court must remain vigilant against inference stacking, which is impermissible because when the State asks a jury to make a presumption based on another presumption, the State fails to carry its burden to present sufficient evidence. [Citation omitted.]" *State v. Gonzalez*, 311 Kan. __, 460 P.3d 348, 358 (2020).

As mentioned, the State argues Gibson's statement to Detective Johnson of "I know I did it" alone provides the jury sufficient basis to conclude his conduct was knowing. But when viewed in context, that statement does not necessarily mean he knowingly pushed the infant facedown into the mattress. Detective Johnson asked Gibson, "Where were you holding when you held her against the bed?" Gibson answered, "I am not even sure I just know that I did it when it's she woke me up." He said he woke up from her crying and "without even knowing" what he was doing, pushed her face into the bed.

15

We hold that when Gibson's statements are combined with the other circumstantial evidence, the totality is sufficient to establish the required mental state element. The baby died with abrasions and contusions on her cheeks, nose, and eyes. She had an abraded contusion in her mouth. Her mother testified S.N.R. was in good health when she left her with Gibson and that other than a little scrape on her forehead, the baby had no injuries. And the photograph of Gibson and the baby sent to the mother about three hours before S.N.R.'s death showed no injuries on her face. The mother testified that when on her stomach, S.N.R. could push her head up and look around.

The district court instructed the jury that "[t]he defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains of or the circumstances in which he is acting." See K.S.A. 2019 Supp. 21-5202(i) ("A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. . . ."). And Gibson told Dr. Steffen he held the baby's head face down into the bed for about 20 to 30 seconds. He also told Detective Johnson he held her down for less than a minute.

Gibson does not challenge the evidence's sufficiency showing he killed S.N.R. with the cause of death being asphyxiation due to suffocation from forced pressure applied to the back of her upper body. In *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001), the court held "death by strangulation can be strong evidence of premeditation." If manual strangulation is strong evidence of premeditation, then the evidence proving S.N.R. was pushed down for enough time to cause her suffocation is sufficient to prove Gibson acted knowingly.

Circumstantial evidence surrounding the cause of the death can be proof that a defendant had a chance to "'take a second look' or deliberate." *Scott*, 271 Kan. at 109.

16

Like strangulation, suffocation is "'time consuming.'" 271 Kan. at 109. Whether it was 20 seconds or more, a reasonable inference to be drawn from that evidence would be that Gibson knowingly pushed S.N.R.'s head against the bed. See *Banks*, 306 Kan. at 859 (verdict may be sustained if circumstantial evidence supporting it allows the fact-finder to draw a reasonable inference about the fact in issue and that circumstantial evidence need not exclude every other reasonable conclusion to be sufficient to support a conviction). This does not present an inference stacking problem.

Finally, Gibson claims the State failed to prove his actions fit within the statutory meaning of "cruel," whose meaning the jury asked about during deliberations. The court told them "cruel" is defined as:

> "Pittyless [*sic*]

> "Or

> "Designed to inflict a high degree of pain,

> "Utter indifference to

> "Or

> "Enjoyment of the suffering of others."

Gibson does not challenge that description on appeal. He instead asserts: (1) the State never alleged his action was cruel; (2) no testimony existed supporting his conduct was pitiless or designed to inflict a high degree of pain; and (3) no evidence was presented to show his action constituted an utter indifference to or an enjoyment of the suffering of the baby. But these claims have no merit. The jury was instructed to use

17

common knowledge and experience in determining facts at issue. And the jury could have concluded Gibson pushed S.N.R.'s head down long enough to kill her, showing utter indifference or acting without pity. The injuries on her face, those in her mouth, and her death itself amount to sufficient evidence to sustain his convictions.

We hold all the evidence when viewed in a light most favorable to the prosecution was sufficient for a rational fact-finder to have found Gibson's action was knowingly done and cruel as required by K.S.A. 2019 Supp. 21-5602(a)(3).

THE JURY INSTRUCTION

The district court instructed the jury:

> "The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. *If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty*." (Emphasis added.)

On appeal Gibson challenges the court's use of the auxiliary verb "should" in the jury instruction, arguing it ought to have been replaced with "may" to ensure the jury understood it was under no obligation to make a guilty verdict. He claims an instruction stating the jury *should* convict if it is satisfied with the evidence beyond a reasonable doubt is an inaccurate statement of law because "the word 'should' comes too close to directing a verdict for the State," while an instruction providing the jury *may* convict a defendant would be legally appropriate.

This argument lacks merit. *Patterson*, 311 Kan. at 68-69. The *Patterson* court held a similar reasonable doubt instruction did not undermine the jury's nullification power,

18

and, therefore, was legally appropriate. 311 Kan. at 68-69. Telling the jury it "'should' convict absent reasonable doubt" is appropriate because it is improper to tell the jury it may nullify. 311 Kan. at 68-69 (citing *State v. Boothby*, 310 Kan. 619, 630, 448 P.3d 416 [2019]). And the instruction did not raise the directed verdict concerns underlying the court's disapproval of another instruction that did foreclose nullification as a possibility by mandating that the jury "''will enter a verdict of guilty''" absent reasonable doubt. 311 Kan. at 68-69 (distinguishing *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 [2014]).

We hold it is not a misstatement of the law to tell a jury: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

CUMULATIVE ERROR

There are no trial errors to accumulate. See *State v. Williams*, 308 Kan. 1320, 1335, 429 P.3d 201 (2018).

LIFETIME POSTRELEASE SUPERVISION

The district court erroneously imposed lifetime postrelease supervision. Our caselaw is clear that "[a] sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid, indeterminate life sentence." *State v. Becker*, 311 Kan. 176, 191, 459 P.3d 173 (2020). Gibson is correct that the court improperly ordered lifetime postrelease supervision, but his request to remand for resentencing is not warranted. Instead, this portion of this sentence is vacated. 311 Kan. at 191 ("The improper imposition of lifetime postrelease supervision can be vacated, allowing the district court to correct the judgment without the need for further proceedings.").

19

We affirm Gibson's convictions and vacate his lifetime postrelease supervision.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Michael E. Ward was appointed to hear case No. 119,993 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.