MODIFIED OPINION[1]

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,761

STATE OF KANSAS,
*Appellee*,

v.

MEGAN DANIELLE EULER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Venue can be proven with circumstantial evidence.

2.

When the plain language of a criminal statute unambiguously applies to a given set of facts, the Legislature necessarily intended that statute to apply.

3.

When two or more criminal statutes can apply to a given set of facts, the identical offense doctrine is the proper analytical tool to determine which crime the defendant can be convicted of and sentenced under.

---

[1]**REPORTER'S NOTE**: Opinion No. 119,761 was modified by the Kansas Supreme Court on December 10, 2021, in response to the appellant's motion for rehearing. The modification is the new language in the parentheses on page 7.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 7, 2020. Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Original opinion filed August 6, 2021. Modified opinion filed December 10, 2021. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kendall S. Kaut*, assistant district attorney, argued the cause, and *Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  In the summer of 2016, Anna Oman noticed an unauthorized charge to her bank account for $223.87 by the Worlds of Fun amusement park. She confirmed she still physically possessed the debit card and contacted Worlds of Fun. The park flagged the tickets in case anyone attempted to use them.

A few days later, on July 4, Megan Danielle Euler tried to enter Worlds of Fun with her boyfriend and children using the flagged tickets. Euler and Oman were both employees of the Johnson County office of the Waddell & Reed investment firm and had adjacent cubicles. Kansas City Police Department Sergeant James Slaughter began to investigate the ticket caper.

Sergeant Slaughter asked Euler how she acquired the tickets, and Euler told him she purchased the tickets from Melissa Ralph on July 1. Despite a records search, Sergeant Slaughter was unable to pin down the identity, location, or even existence of Melissa Ralph. Euler then denied working for Waddell & Reed—claiming instead that

2

she worked for a fitness company. Purchase records revealed the tickets were purchased at 11:53 a.m. on July 1 using Oman's home address to verify the purchase.

Oman reported that she believed Euler lifted the debit card information from Oman's desk and purchased the tickets during a Waddell & Reed ice cream social on July 1, 2016. Oman remembered Euler coming to the event later than the other employees and had noticed the Worlds of Fun website displayed on Euler's work computer earlier that week. The day before the debit charge appeared on Oman's account, Euler had emailed Oman and asked for her address, claiming Euler's daughter wanted to mail Oman something. Oman provided her home address to Euler. This proved significant because not even Waddell & Reed had her home address on file. (Oman preferred to use her parents' address for employment correspondence and records.)

The State charged Euler with identity theft and theft of property, but later dismissed the theft of property charge. At trial, the State's evidence was as recited above. Euler testified and provided a different narrative of events. According to Euler, she had taken her daughter, Camille, to the Department of Motor Vehicles (DMV) to get an ID on the morning of July 1, 2016. Camille's testimony corroborated this, as she testified that she and Euler left for the DMV around 10 in the morning from their home in Johnson County.

They were at the DMV for about two and a half hours. Afterwards, they stopped at McDonald's and headed to Waddell & Reed to pick up Euler's paycheck. Employee badge records indicate Euler arrived at Waddell & Reed around 1 p.m. Euler then returned to Waddell & Reed after her paycheck did not clear at her bank. Employee badge records again showed Euler returning to Waddell & Reed's human resources department at 2:14 p.m. Euler testified that at this point, she discovered the tickets underneath her keyboard when she stopped by her desk to grab her sunglasses. According

3

to Euler, she had previously received anonymous gifts from coworkers who knew she was struggling financially.

The jury convicted Euler of identity theft, and the district court sentenced Euler to 18 months of probation with an underlying 10-month prison sentence. Euler raised two claims on direct appeal. First, she argued the State failed to present sufficient evidence of venue in Johnson County—that is, Euler argued that the State presented no evidence that the tickets were actually purchased while the purchaser was in Johnson County. Second, she claimed she should have been convicted for the more specific criminal offense of criminal use of a financial card, rather than identity theft.

The State argued there was sufficient evidence to establish Euler used the stolen information in Johnson County because on the day the tickets were purchased, Euler spent the entire morning in Johnson County—either at home, work, or at the DMV. Although there was no direct testimony about *which* DMV Euler went to, the State argued the jurors could reasonably infer from the evidence and their common sense the DMV was in Johnson County. The Court of Appeals panel agreed and held there was sufficient evidence to show venue was proper.

Next, the panel considered Euler's argument she should have been convicted of the more specific crime of criminal use of a financial card. The lower court affirmed Euler's conviction because "[u]sing a person's name, address, and debit card number to defraud another person . . . is beyond the conduct listed in the criminal use of a financial card statute and is directly addressed by the identity theft statute." *State v. Euler*, No. 119,761, 2020 WL 593956, at *5 (Kan. App. 2020) (unpublished opinion). The panel held criminal use of a credit card is not a more specific offense because the "identity theft statute and the criminal use of a financial card statute are aimed at preventing different types of

4

behavior and thus the general versus specific rationale does not apply." 2020 WL 593956, at \*5-7. We granted Euler's petition for review.

DISCUSSION

Euler now renews the claims she brought before the Court of Appeals. We agree the State presented sufficient evidence to establish venue in Johnson County. We likewise conclude Euler was properly convicted of identity theft—though our reasoning differs slightly from the Court of Appeals, as we will explain more fully below. Hence, we affirm.

*Venue*

A person commits identity theft by "obtaining, possessing, transferring, using, selling or purchasing any personal identifying information . . . with the intent to . . . [d]efraud that person . . . to receive any benefit; or misrepresent that person in order to subject that person to economic or bodily harm." K.S.A. 2020 Supp. 21-6107(a)(1)-(2). But in this case, the State narrowed its claim to one of "use." The jury was likewise instructed as follows:

> "The defendant is charged with identity theft. The defendant pleads not guilty. To establish this charge, each [of] the following claims must be proved:
>
> "1.  The defendant used any personal identifying information or document containing personal identifying information belonging to or issued to Anna Oman.
>
> "2.  The defendant did so with the intent to defraud Anna Oman or Worlds of Fun in order to receive a benefit.

5

"3. This act occurred on or about the 1st day of July, 2016, and any requisite act to the commission of the crime occurred in Johnson County, Kansas."

Euler has consistently argued the State must show she "used" Oman's information in Johnson County because the State prosecuted her for "using" personal identifying information. Euler's argument relies exclusively on the window of time between 10 a.m. and 1 p.m. on July 1. She concedes that the uncontroverted evidence established that she was in Johnson County at both 10 a.m. and 1 p.m., but she argues there was no evidence of her location—other than being at an unspecified DMV—between those two times. And because the tickets were purchased at 11:53 a.m., Euler argues there is insufficient evidence for a jury to conclude that this event happened while Euler was in Johnson County.

The State contends the evidence was sufficient for a jury to infer that the DMV was in Johnson County. The State points to Johnson County being Camille and Euler's county of residence, and the common-sense notion that one would not go to a DMV in a county in which they do not reside. Euler argues this evidence could not create a reasonable inference that the DMV was located in Johnson County, and even if the jury could infer Camille would receive an ID of her county of residence, this would amount to improper inference stacking.

When determining whether evidence is sufficient, appellate courts consider the entire record in the light most favorable to the prosecution to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Gibson*, 311 Kan. 732, 742, 466 P.3d 919 (2020). In doing so, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Verdicts may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial

6

evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Given this standard of review, we consider the DMV dispute to be a distraction from the real question before us—was there sufficient evidence for a jury to conclude Euler was in Johnson County at 11:53 a.m. on July 1? The uncontroverted evidence puts Euler in Johnson County at both 10 a.m. and 1 p.m. on July 1. Euler lived and worked in Johnson County. There was no evidence presented that Euler left Johnson County on July 1. This alone is sufficient for a jury to conclude that Euler was, in fact, in Johnson County at 11:53 a.m. on July 1.

*Identity Theft Conviction*

It is often the case that a particular set of facts—if proven beyond a reasonable doubt—could support a conviction under several different statutes. This has given rise to a dubious "rule" in our jurisprudence that Euler now relies on. The rule suggests that when a set of facts supports a conviction under two different criminal statutes, the defendant can only be convicted under the "more specific" statute. (We note, in passing, that Euler may have had a similar statutory claim had she invoked K.S.A. 2020 Supp. 21-5109[d]. But she did not, and we express no opinion on the possible applicability of that statute to this case.) And here, Euler argues that because the facts in this case would support a conviction for criminal use of a financial card under K.S.A. 2020 Supp. 21-5828(a)(1), that is the more specific statute and the only crime she can be convicted of.

But upon closer analysis, this rule has questionable applicability and sketchy origins in our caselaw. It seems to have appeared for the first time in *State v. Helms*, 242 Kan. 511, 748 P.2d 425 (1988). There, the defendant contended that "indecent

7

liberties with a child is a 'more specific' statute than rape and, therefore, indecent liberties with a child provides the exclusive basis upon which he may be charged, convicted, and punished. [Citations omitted.]" 242 Kan. at 512. We specifically noted that the defendant cited "no authority to support [this] contention, and we have found none." 242 Kan. at 512.

Nonetheless, the *Helms* court went on to discuss in broad strokes the rule that a specific statute controls over a general one but observed that the cases discussing this general rule had never applied to foreclose prosecution under one or the other statute—only to prohibit multiple convictions for the same conduct. 242 Kan. at 513. Ultimately, we held that "[a]lthough both crimes may be coincidentally present in the same set of factual events, the two crimes are directed at different actions." 242 Kan. at 513. Finally, the *Helms* court noted "the rule that a more specific statute should prevail over the general statute is merely a rule of interpretation which is used to determine which statute the legislature intended to be applied in a particular case" and that because the two statutes it was considering had different elements, the rule "has no application in the present case." 242 Kan. at 514. And just in case that was unclear, the court put a final nail in the coffin of this "rule" in the criminal context by saying that even if the rule "were to apply in the present case, the rule as a means of determining legislative intent must yield where there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity." 242 Kan. at 514.

The seminal decision from our court discussing the rule in this century is *State v. Williams*, 299 Kan. 911, 329 P.3d 400 (2014). There, we considered the defendant's claim under both the identical offense doctrine and the more specific statute "rule." But again, we noted that the more specific crime rule is actually not a legal rule at all but rather a "'rule of interpretation . . . used to determine which statute the legislature intended to be applied in a particular case.'" 299 Kan. at 930 (quoting *Helms*, 242 Kan. at 514); see also

8

*State v. Cott*, 288 Kan. 643, Syl. ¶ 2, 206 P.3d 514 (2009) ("The rule that a general statute should yield to a specific statute covering the same criminal conduct is a rule of statutory construction designed to determine legislative intent, and it must yield where there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity."). The *Williams* court went ahead and did an analysis of legislative history to determine that the rule had no applicability in that case either.

In considering this caselaw development, we note first that this appears to be an accidental "rule" which was never intended to apply to two statutes with divergent elements. And importantly, as a tool of statutory interpretation to divine legislative intent, the rule appears to be an anachronism held-over from the days prior to our more rigorous insistence on the governing principle of statutory plain language. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 363-68, 361 P.3d 504 (2015) (following the modern "trend of plain language statutory interpretation" and overruling prior precedent which did not look to statutory plain language when determining legislative intent); *State v. Spencer Gifts, LLC,* 304 Kan. 755, 761-69, 374 P.3d 680 (2016) (same). Indeed, when a criminal statute by its plain language unambiguously applies to a given set of facts, there can be no conclusion under our current rules of statutory interpretation other than that the Legislature *intended the statute to apply*. Given this, the legislative intent exception swallows the "more specific statute rule" whole.

Before concluding, it will be helpful to review the specifics of Euler's claims.

"Identity theft is obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to:

"(1) Defraud that person, or anyone else, in order to receive any benefit; or

9

"(2) misrepresent that person in order to subject that person to economic or bodily harm." K.S.A. 2020 Supp. 21-6107(a).

"Personal identifying information" includes a person's name, address, and financial number—including credit or debit card numbers—which give access to that person's financial resources. K.S.A. 2020 Supp. 21-6107(e)(2)(A), (C), (M). K.S.A. 2020 Supp. 21-6107(c)(1). K.S.A. 2020 Supp. 21-5828(a)(1)-(3) defines criminal use of a financial card as "[u]sing a financial card without the consent of the cardholder; . . . using a financial card, or the number or description thereof, which has been revoked or canceled; or . . . using a falsified, mutilated, altered or nonexistent financial card or a number or description thereof," "done with the intent to defraud and to obtain money, goods, property or services."

So Euler is correct that in the words of *Helms*, "both crimes [are] coincidentally present in the same set of factual events." See 242 Kan. at 513. In other words, it is true that the evidence presented against Euler would have been sufficient to support a conviction of criminal use of a financial card under K.S.A. 2020 Supp. 21-5828. But to support a conviction for identity theft, the statute required the State to prove an added element not included in the criminal use statute. Specifically, identity theft requires the State to show that the financial card or number belonged to "another person." There are numerous financial cards that do not belong to individually identifiable people and which do not give access to a person's financial resources. Put simply, stealing a financial card belonging to a corporate entity rather than an individually identifiable person cannot be identity theft, but it can be criminal use of a financial card. Stated another way, an element the State must prove in any identity theft prosecution is that the "personal identifying information" at issue belonged to another natural person. This element need not be proven in a prosecution for criminal use of a financial card.

10

It is true that the general definition of "person" in K.S.A. 2020 Supp. 21-5111(t) includes entities other than natural persons. That definition, however, does not apply "when a particular context clearly requires a different meaning." K.S.A. 2020 Supp. 21-5111. We have little difficulty concluding that the context of the identity theft statute makes it clear that the Legislature intended to criminalize only circumstances involving personal identifying information belonging to natural persons.

There are numerous crimes which can only be committed against a natural person. This, even though the Legislature uses the more general term "person" in each of the statutes. For example, kidnapping involves the "taking or confining of any person"; assisted suicide involves "causing another person to commit or attempt to commit suicide"; criminal restraint involves "restraining another person"; assault involves "placing another person in reasonable apprehension"; battery involves causing "bodily harm [or] . . . physical contact with another person"; robbery involves "taking property from the person." See K.S.A. 2020 Supp. 21-5408; K.S.A. 2020 Supp. 21-5407; K.S.A. 2020 Supp. 21-5411; K.S.A. 2020 Supp. 21-5412; K.S.A. 2020 Supp. 21-5413; K.S.A. 2020 Supp. 21-5420. Each of these statutes refers only to natural persons. A non-natural person cannot be kidnapped, assaulted, or robbed.

Similarly, our identity theft statute specifically applies to the personal identifying information of natural persons. The statutorily defined list of personal identifying information is plainly describing information possessed by natural persons, including birthdays; social security numbers; places of employment; familial names; birth, death, and marriage certificates; and signatures. K.S.A. 2020 Supp. 21-6107(e)(2). While some of the items on the list could be possessed by a non-natural person—such as a financial number—the overall character of the list convinces us that the Legislature intended to protect only personal identifying information belonging to natural persons.

11

In addition, the word "identity" has a plain and clear meaning today that connotes something that is personally possessed by an individual human being. Merriam-Webster defines identity as "the distinguishing character or personality of an individual." Merriam-Webster's Collegiate Dictionary 616 (11th ed. 2003). "Identity theft" is defined as "the illegal use of someone else's personal information (as a Social Security number) in order to obtain money or credit." Merriam-Webster's Collegiate Dictionary 616 (11th ed. 2003). The word "someone" is a pronoun that refers exclusively to an indefinite human person. The word "personal"—which is used in many definitions of "identity" as well as in our identity theft statute—means something of or relating to a human person. Black's Law Dictionary 1143 (6th ed. 1990) ("partaking of the qualities of human beings").

Taken together, it is clear from the specific words, syntax, and structure of our identity theft statute that the Legislature intended that the identity being stolen or otherwise used be proven to be or have been the identity of a human person. Thus, we conclude that the crime of identity theft has an element not present in the crime of criminal use of a financial card—namely, that the information at issue in the case belongs to a natural person.

Given all of this, we have no difficulty concluding that the "rule" that the more specific statute controls has no applicability in this case. Because when the rule was first discussed it had no applicability in such cases, but more importantly because we hold that when the plain language of a criminal statute unambiguously applies to a given set of facts, the Legislature necessarily intended that statute to apply. The plain language of the identity theft statute unambiguously applies here, even if there is a more specific statute out there that may also apply.

We conclude that the better, more rigorous, predictable, and definable mode of analysis in these kinds of cases proceeds under the identical offense doctrine which requires "where two offenses have identical elements, an offender can be sentenced to only the less severe penalty applying to the two offenses." *State v. Snellings*, 294 Kan. 149, 150, 273 P.3d 739 (2012). The identical offense doctrine can apply when either "some provisions in two statutes overlap, the overlapping provisions apply to the charged crime, and the overlapping provisions are identical except for the penalty provisions" or when "all provisions in two statutes are identical except for the penalty provisions." *Williams*, 299 Kan. at 926 (quoting *Snellings*, 294 Kan. at 152). We have made it clear that these are elements-based tests. See *Williams*, 299 Kan. at 926 ("'[T]he test is not whether the facts would support an alternative charge but whether the applicable elements of the charged offense are identical to the elements of an offense imposing a lesser penalty, *i.e.*, what facts the State is required to prove to obtain a conviction.'").

Because the elements of identity theft and criminal use of a financial card are different, the two statutes do not present identical offenses even if a particular set of facts can support a conviction under either statute. We hold the Court of Appeals did not err when it found the more specific statute rule does not apply to this case because the Legislature intended the identity theft statute to apply.

Affirmed.

STANDRIDGE, J., not participating.

* * *

BILES, J., concurring: I agree Megan Euler's conviction and sentence for identity theft should be affirmed. I write separately because the majority's rationale ventures beyond where it needs to go by concocting a judicially inspired distinction for identity

13

theft prosecutions between natural persons and corporate entities. Slip op. at 10-11. This holding now denies the State the ability to prosecute the more serious crime of identity theft when the victim is a Kansas business. This may or may not be what the Legislature intended, yet that is where the majority unnecessarily takes us. Just as troubling, this newly announced distinction was not vetted through the usual back and forth of our adversarial system. The parties did not argue it in their briefs, the Court of Appeals did not address it when deciding the case, and it got only brief mention in response to a question during oral arguments. Why the majority drifts outside this case's boundaries is a mystery.

The facts are straightforward. In the summer of 2016, Anna Oman noticed an unauthorized charge to her bank account for $223.87 by the Worlds of Fun amusement park. She confirmed she still physically possessed her debit card and contacted Worlds of Fun. She learned the tickets were purchased at 11:53 a.m. on July 1 using her home address to verify the transaction. The Worlds of Fun record for this transaction lists Oman's name as the customer and her home address. The evidence also shows Euler had emailed Oman and asked for and received her address the day before the debit charge appeared on Oman's account.

The State charged Euler with identity theft under K.S.A. 2020 Supp. 21-6107. The relevant statutory language is in subsection (a)(1). It reads: "Identity theft is obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: [d]efraud that person, or anyone else, in order to receive any benefit." Subsection (e)(2) defines "personal identifying information" to include "but is not limited to":

14

"(A) Name;

"(B) birth date;

"(C) address;

"(D) telephone number;

"(E) driver's license number or card or nondriver's identification number or card;

"(F) social security number or card;

"(G) place of employment;

"(H) employee identification numbers or other personal identification numbers or cards;

"(I) mother's maiden name;

"(J) birth, death or marriage certificates;

"(K) electronic identification numbers;

"(L) electronic signatures;

"(M) any financial number, or password that can be used to access a person's financial resources, including, but not limited to, checking or savings accounts, credit or debit card information, demand deposit or medical information; and

"(N) passwords, usernames or other log-in information that can be used to access a person's personal electronic content, including, but not limited to, content stored on a social networking website."

15

Based on the evidence, for purposes of the identity theft statute, Euler obtained, possessed, and used three statutorily defined personal identifying information data points to complete her crime: Oman's name under subsection (e)(2)(A), Oman's address under subsection (e)(2)(C), and Oman's financial number, i.e., the debit card number under subsection (e)(2)(M). And we know from the evidence that Worlds of Fun had Oman's home address for the ticket purchase. So it is reasonable to infer the company got Oman's address from Euler as part of the illicit ticket purchase, especially given the circumstantial evidence that Euler obtained the address precisely for that purpose.

When instructing the jury on identity theft, the district court narrowed the jury's focus to Euler's "use" of Oman's "personal identifying information" and made no reference to Euler obtaining or possessing that information. The instruction read:

"The defendant is charged with identity theft. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"1.     The defendant *used* any personal identifying information or document containing personal identifying information belonging to or issued to Anna Oman.

"2.     The defendant did so with the intent to defraud Anna Oman or Worlds of Fun in order to receive a benefit.

"3.     This act occurred on or about the 1st day of July, 2016, and any requisite act to the commission of the crime occurred in Johnson County, Kansas." (Emphasis added.)

16

The jury instructions also defined "personal identifying information" along the statutory lines recited in K.S.A. 2020 Supp. 21-6107(e)(2). So based on the court's instructions, the jury could certainly infer from the evidence for purposes of convicting her under the identity theft statute that Euler "used" Oman's name, address, and her financial number, i.e., the debit card number. And the prosecutor drove that home in her closing arguments by emphasizing Euler had both access and opportunity to use Oman's name and address, as well as the debit card information, to complete the transaction. She specifically mentioned Euler having Oman's address before the purchase and using it when buying the tickets.

Euler argues she should have been convicted of what she asserts is the more specific crime of criminal use of a financial card under K.S.A. 2020 Supp. 21-5828, and should be resentenced accordingly. The majority persuasively shows the fact that when the identity theft statute's plain language applies to a defendant's conduct, this prevents the defendant from claiming the prosecution must proceed under some other statute. Slip op. at 11-12 ("[W]e hold that when the plain language of a criminal statute unambiguously applies to a given set of facts, the Legislature necessarily intended that statute to apply."). The question then is whether the identical offense sentencing doctrine requires the penalty provisions of the lesser crime to be applied. The majority's discussion of the identity theft statute's "person" element, however, is unnecessary to decide that.

In its most basic form, the identical offense sentencing doctrine holds that "if two criminal offenses have *identical elements* but different penalty classifications, a defendant convicted of either crime may be sentenced only under the lesser penalty provision." (Emphasis added.) *State v. Friday*, 297 Kan. 1023, 1046, 306 P.3d 265 (2013). This doctrine allows room for application to statutes that are divisible in some fashion. As the majority observes, when two statutes contain overlapping provisions, this

17

court must examine the facts to determine the area of overlap. And once a court determines which provisions of a statute apply, the only remaining question is whether the overlapping provisions contain identical elements—a determination that is made from the statute. Slip op. at 12-13.

In *State v. Campbell*, 279 Kan. 1, 16-17, 106 P.3d 1129 (2005), our court applied this doctrine to a defendant's conviction for unlawful possession of ephedrine with the intent to manufacture methamphetamine—a severity level 1 drug crime. The court held this offense was identical to overlapping provisions of possession of drug paraphernalia with intent to manufacture a controlled substance, a severity level 4 felony. The court noted ephedrine fell within the lesser statute's definition of drug paraphernalia, and that methamphetamine was a controlled substance. In holding the defendant could only be given the sentence that would apply to the less severe offense, the court reasoned,

> "In the circumstances of this case, the elements of the offense were knowingly possessing ephedrine or pseudoephedrine with the intent to use it to manufacture a controlled substance. The elements were the same whether Campbell had been charged under the ephedrine statute or the drug paraphernalia statute. Consequently, he must be sentenced under the lesser penalty provisions for violation of 65-4152(a)(3)." 279 Kan. at 16-17.

In other words, the *elements* of the convicted crime *necessarily constituted* the lesser crime. See *State v. Snellings*, 294 Kan. 149, 166, 273 P.3d 739 (2012) ("'Once it is determined which provisions of a statute apply, the only question is whether the overlapping provisions contain identical elements.' . . . 'That determination is made from the statute.'"). As a counter example, the *Snellings* court addressed the defendant's claim that his conviction for manufacture of methamphetamine, a severity level 1 drug felony, should be sentenced to the penalty applicable to compounding a controlled substance containing ephedrine or pseudoephedrine, a misdemeanor. He argued his crime of conviction defined manufacture to include "compounding," and that a "controlled

18

substance" is manufactured. 294 Kan. at 161. The court rejected this, noting the definition of "controlled substance" in the less severe crime did not include methamphetamine, the controlled substance the defendant was convicted of manufacturing. 294 Kan. at 166. The elements of the convicted offense did not constitute the defendant's preferred lesser crime.

Here, the *elements* of Euler's identity theft conviction show they do *not necessarily* constitute her preferred offense of criminal use of a financial card. The relevant statutory language for that preferred offense reads: "Criminal use of a financial card is any of the following acts done with intent to defraud and to obtain money, goods, property or services," and one of those acts is "[u]sing a financial card without the consent of the cardholder." K.S.A. 2020 Supp. 21-5828(a)(1). Subsection (c) provides definitions relevant to Euler's claims. It defines "'[f]inancial card'" to mean "an identification card, plate, instrument, device or number issued by a business organization authorizing the cardholder to purchase, lease or otherwise obtain money, goods, property or services or to conduct other financial transactions." And Subsection (c)(2) provides: "'cardholder'" means "the person or entity to whom or for whose benefit a financial card is issued."

What is obvious is that her preferred offense under K.S.A. 2020 Supp. 21-5828 has an element not present in her convicted crime under K.S.A. 2020 Supp. 21-6107—the former requires using the financial card *without the cardholder's consent*. And this fact was not found by the jury in the district court. See *State v. Yazell*, 311 Kan. 625, 627, 465 P.3d 1147 (2020) ("Kansas appellate courts do not make factual findings."). What's more, a comparison of the elements of the two statutes shows the supposed overlapping provisions that Euler claims are really not identical. Besides the consent element added to the financial card crime, the identity theft crime's personal identifying information element is broader than just the "financial card" element required in K.S.A. 2020 Supp. 21-5828.

19

Euler's conviction went beyond the overlapping portions of the two statutes because her crime of conviction permitted the use of Oman's name and address to be considered personal identifying information. As a result, I would hold that the identical offense doctrine is not applicable because of the broader element in the convicted crime—not because of some "natural person element" as the majority touts. See *Snellings*, 294 Kan. at 166 ("For example, in this case, we look to the facts to tell us that Snellings was convicted of manufacturing methamphetamine. Once this is established, a comparison of the elements of K.S.A. 2007 Supp. 65-4159[a] and K.S.A. 65-4164[a] reveals that there is no overlap because methamphetamine is not a controlled substance to which K.S.A. 65-4164[a] applies. Consequently, the manufacture of methamphetamine under K.S.A. 2007 Supp. 65-4159[a] does not overlap with and is not identical to compounding a controlled substance containing ephedrine or pseudoephedrine under K.S.A. 65-4164[a]."); *State v. Williams*, Kan. 299 Kan. 911, 926, 329 P.3d 400 (2014) ("'[T]he test is not whether the facts would support an alternative charge but whether the applicable elements of the charged offense are identical to the elements of an offense imposing a lesser penalty, *i.e.*, what facts the State is required to prove to obtain a conviction.'").

The plain language of the identity theft statute unambiguously applies here, even if there is a different statute out there that may also apply. And the elements of Euler's identity theft conviction do not necessarily constitute the criminal use of a financial card. Based on this, I have no difficulty concluding the identical offense sentencing doctrine does not afford Euler relief. But I do not need to limit the crime of identity theft to only natural person victims to decide that in Euler's case.

20

Based on how the jury was instructed, the State's evidence, and the State's arguments, it is clear the jury had the ability to convict Euler for using personal identifying information other than just the financial card number. And I note Euler does not challenge how the jury was instructed on the crime of conviction or how the State argued its case.

For all these reasons, I would hold there is a sufficient basis to affirm Euler's conviction and sentence without deciding that Kansas business entities are excluded as potential victims from the more serious crime of identity theft.

LUCKERT, C.J., joins the foregoing concurring opinion.